**Robert C. MULLINS, d/b/a Clinton Texaco, Edward D. Stokes, d/b/a Ed's Skyline Texaco, Frank Stone, d/b/a Frank Stone & Sons and Rudy Thomas, d/b/a Rudy's Texaco Service, Plaintiffs–Appellants,**

v.

**The UNITED STATES DEPARTMENT OF ENERGY, Hazel R. O'Leary, Secretary of Energy, Office of Hearings and Appeals, George B. Breznay, Director, Office of Hearing and Appeals, Economic Regulatory Administration, Paul M. Geier, Secretary, Economic Regulatory Administration, Defendants–Appellees.**

No. 93–1424.

United States Court of Appeals, Federal Circuit.

March 13, 1995.

Rehearing Denied; Suggestion for Rehearing In Banc Declined June 8, 1995.

Len W. Ogden, Jr., The Sinnott House, Paducah, KY, argued, for plaintiffs-appellants.

Don W. Crockett, Judicial Litigation Div., Economic Regulatory Admin., U.S. Dept. of Energy, Washington, DC, argued, for defendants-appellees.

Before ARCHER, Chief Judge,* PLAGER and SCHALL, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Dissenting opinion filed by Chief Judge ARCHER.

PLAGER, Circuit Judge.

Plaintiffs, owners of Texaco service stations, sought a declaratory judgment that the Department of Energy ("Agency") erred in its implementation of special refund procedures for the disbursement of some $1.2 billion that the Agency secured from Texaco, Inc. in settlement of certain Agency enforcement actions. The District Court for the Western District of Kentucky declined to disturb the Agency action, and granted the Agency's motion for summary judgment. *Mullins v. United States Dep't of Energy,* 821 F.Supp. 1194 (W.D.Ky.1993) (*Mullins*). We affirm.

## BACKGROUND

This case involves a long-running dispute between Texaco, Inc. and the Agency regarding alleged overcharges by Texaco in the sales of petroleum products, in violation of regulations passed under the authority of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (1976) ("ESA"),[1] and the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.* (1976). The sales occurred over a number of years, from 1974 to 1981, and Texaco's potential liability for the alleged violations was in the billions of dollars.

The compliance proceedings initiated by the Agency were still pending in 1988, when

---

* Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

1. Because the entire ESA is printed at 12 U.S.C. § 1904 note (1976), this opinion cites the ESA thus: ESA § ——.

the parties agreed on a settlement. The settlement was to cost Texaco about $1.2 billion. The bulk of the settlement fund was to be divided into two pools, one to provide restitution for violations regarding sales of crude oil, the other for violations regarding sales of refined products.

Plaintiffs are potential beneficiaries of the funds designated for the refined products pool.[2] As the enormity of the liability and the size of the settlement suggest, the procedures for resolving such a dispute are elaborate and involve a series of decision stages. When all was said and done, the agreed settlement allotted 90% of the fund to the crude oil pool, and 10% to the refined products pool. These percentage allocations not only determine the size of the pool, but they also affect the formula for refunds from the refined products pool.

In the course of the proceedings conducted by the Agency, it was initially estimated that Texaco's maximum liability was about $2.2 billion, attributing 84% to crude oil violations and 16% to refined products violations. Had these percentages prevailed, not only would the refined products pool be larger, but under the formula for refunds plaintiffs' shares would be larger. For example, under the 90–10 split, plaintiff Ed's Skyline Texaco will receive a refund of $3,657, plus interest, whereas the award would be $5,983, plus interest, under an 84–16 split.

Plaintiffs argue that the 90–10 split incorporated in the settlement does not meet the requirement that refunds be distributed in an equitable manner, 10 C.F.R. § 205.282(e) (1994), and the decision to use a 90–10 split is not supported by substantial evidence in the record, as required by ESA § 211(d)(1).

## DISCUSSION

■ The dispute turns on whether there is sufficient evidence in the record to explain why the 90–10 split was chosen, rather than some other numbers, such as the 84–16 allocation initially identified. The answer the Government gives is that the lawyers and Agency officials who handled the case determined that the cost of litigation to prove the violations, and the chances of success in that litigation, were such, in the opinion of the responsible officials, that the amount settled for and the proportions agreed to were fully justified.

Plaintiffs respond, correctly, that that answer is at best conclusory, and finds no detailed support in the record. They ask that we require the Government to explicate with greater specificity exactly why and how the 90–10 numbers were arrived at, and what there was in the litigation that led to these conclusions. At first blush, plaintiffs have a legitimate complaint. The best the record contains are statements such as:

[The Agency's] assessment of the value of refined product and crude oil issues is the result of consideration of the various litigation risks associated with the different cases, the linkage of certain refined product issues which could substantially alter dollar liability amounts, and the relatively early stages of litigation for many of the refined product issues as compared to the crude oil pricing issues.

Final Consent Order with Texaco, Inc., 53 Fed.Reg. 32,929, 32,931 (1988).

■ At bottom, then, the question is whether a reviewing court would be in a better position to judge the rationality of the settlement if it knew more about what the officials who settled the dispute thought about the litigation alternative. It is well established that agencies have a duty to provide reviewing courts with a sufficient explanation for their decisions so that those decisions may be judged against the relevant statutory standards, and that failure to provide such an explanation is grounds for striking down the action. *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.").

Here, however, the particular piece of information being sought does not involve fac-

---

2. The refined products pool is available to pay restitution to specific retailers of Texaco products. For the crude oil pool, 20% was allocated to satisfy the claims of injured purchasers of crude oil, and the balance was divided equally between the states and the federal government as indirect restitution.

tual matter as such. Rather, what is at issue is a judgment call, made by Agency officials, regarding how they wanted to invest Agency resources, what terms to accept and what chances there were of doing better in court than in the settlement, and what the public interest required. Even assuming all the considerations that went into that judgment call could fairly be presented to a court, the call regarding whether to settle and on what terms nevertheless would remain one peculiarly the province of the executive, and not the judiciary. Much like the decisions of prosecutors regarding who to prosecute and who not, some decisions simply do not lend themselves to traditional notions of judicial review.[3]

■ Plaintiffs point to the fact that by selecting a ratio for the pools that is less favorable to plaintiffs, the Government ends up with more money in the crude oil pool, and thus with more money for the Government. That is true, but far from decisive. There is an assumption that government officials perform their duties properly and in good faith. *Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986); *Gonzales v. Defense Logistics Agency,* 772 F.2d 887, 889 (Fed.Cir.1985); *Boyle v. United States,* 515 F.2d 1397, 1401, 207 Ct.Cl. 27 (1975). Absent some showing of fraud or clear wrongdoing, we may not assume that the motivation for selecting the 90–10 split rather than the 84–16 was simply to put more dollars in the federal fisc.

As the trial court observed,

[i]t is not unreasonable that the informed judgment of those involved in the enforcement proceedings and settlement with Texaco could conclude that only $120 million would be sustainable at trial. Likewise, it is not unreasonable that the same informed judgment could conclude that the crude oil cases have a proportionately greater settlement value than the refined products cases.

*Mullins,* 821 F.Supp. at 1200. Admittedly it would be preferable for the record to have revealed more about what went into those judgments, but in the final analysis the relevant judgment had to be the Agency's, not the court's. Given the narrow and specific issue on which this case turns, the trial court did not err in leaving the Agency decision undisturbed.

We have examined the other issues raised by plaintiffs, and find them either to be mooted by our disposition of the case, or otherwise without merit. The judgment of the trial court is

AFFIRMED.

ARCHER, Chief Judge, dissenting.

I cannot join the majority's opinion for, in my view, the administrative record does not disclose a rational basis for the Department of Energy's decision on how to allocate the Texaco settlement. Without such a rational basis, the agency's action is arbitrary or capricious under our statutory standard of review and cannot be sustained.

One of the purposes of the legislation at issue here, the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, as incorporated in the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 *et seq.,* is to provide restitution to purchasers of petroleum products for overcharges by oil producers in contravention of regulatory price controls. *See generally Texas American Oil Corp. v. United States Dep't of Energy,* 44 F.3d 1557 (Fed.Cir.1995) (in banc). The Department of Energy (and its administrative predecessors) have been entrusted by Congress with this task. Energy does not, however, have unfettered discretion to decide how to allocate this restitution. Congress provided that interested parties may appeal such decisions to the district courts, 12 U.S.C. § 1904 note, and that any appeal from a district court's decision will be had to the Federal Circuit, 12 U.S.C. § 1904 note (as amended October 29, 1992); 28 U.S.C. § 1295.

The majority affirms the trial court's judgment sustaining Energy's action because it is a "judgment call," involving policy matters beyond the purview of the judicial branch. While I certainly agree with the majority that courts should not substitute their own

---

**3.** At oral argument, the Government raised the question of whether it would be proper to require the Government to disclose its litigation strategies, since that might have bearing on other pending matters.

policy judgments for those of the cognizant agency, this axiom of agency law does not, in my view, warrant the wholesale abdication of our statutory role on review. Whether this agency action is characterized as "rule-making" or "adjudication," it must satisfy the "arbitrary or capricious" test set forth in 5 U.S.C. § 706(2)(A).[1] I conclude that, on this record, it does not.

An agency action subject to 5 U.S.C. § 706(2)(A) "may be invalidated by a reviewing court under the 'arbitrary or capricious' standard if [it is] not rational and based on consideration of the relevant factors." *Federal Communications Comm'n v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 803, 98 S.Ct. 2096, 2116, 56 L.Ed.2d 697 (1978). While an agency need not make detailed factual findings to support its actions under this standard, the agency's rational basis must be evident in the administrative record, which is the sole source for the reviewing court's "searching and careful" review. *Id.* In this case, the administrative record demonstrates that Energy's rationale for distributing the over $1 billion of settlement monies according to a 10:90 (refined products vs. crude) split consisted primarily of conclusory statements with a few vague references to its consideration of "litigation risks" and "the number and complexity of the legal and factual issues and the time and expense required for the government to fully litigate every issue in order to obtain any recovery." In other words, Energy told settlement claimants, "take our word for it." That is not, in my view, a rational basis for Energy to choose the allocation proportion for at least the reason that it virtually precludes judicial review.

The 10% allocated by Energy to refined products overcharges may be reasonable in light of the estimated 16% of Texaco's maximum possible liability that Energy attributed to refined products overcharge allegations during the settlement. But the conclusory basis Energy gives for its actions could just as easily justify a 5% or a 15% allocation.

Without more, we simply cannot review whether or not such an allocation was arbitrary or capricious. Moreover, in spite of the presumption of regularity accorded to governmental actions, I would not so readily discount the fact that the United States has a significant pecuniary interest in the outcome of how the settlement monies are apportioned in this case and that its interest is diametrically opposed to that of the appellants.

I would vacate the district court's judgment with instructions to remand the case to the agency for further development of the factual record underlying the agency's decision.

---

1. Because I conclude Energy's action cannot be sustained under the "arbitrary or capricious" test, I need not discuss whether the agency action also meets the requirements of the "substantial evidence" test, which some Temporary Emergency Court of Appeals precedent applies to agency regulations, as well as orders. *See International Drilling & Energy Corp. v. Watkins*, 920 F.2d 14, 20 & n. 6 (Temp.Emer.Ct.App.1990); *see also Texas American*, 44 F.3d at 1561 (adopting the precedent of the Temporary Emergency Court of Appeals as Federal Circuit precedent).