NEC CORPORATION and HNSX
Supercomputers, Inc.,
Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, et al., Defendants,

Cray Research, Inc., Defendant–
Intervenor.

Slip Op. 97–23.
Court No. 96–10–02360.

United States Court of
International Trade.

Feb. 12, 1997.

vector super-computers produced in Japan;

2. For *in camera* review: all documents reflecting the nature and content of the discussion at meetings identified in response to Court-ordered discovery;

3. For *in camera* review: all documents concerning the Department of Commerce's communications with Cray Research, Inc. between April 1, 1996 and May 20, 1996;

**On or before 5:00 P.M., Monday, Feb. 24, 1997:**

4. Mr. Stuart Eizenstat, for oral deposition upon written questions to determine whether he has made an advance commitment to a particular outcome in the antidumping investigation of vector supercomputers from Japan;

5. Ms. Susan Esserman and Mr. Paul Joffe for deposition upon oral examination to determine whether they have made an advance commitment to a particular outcome in the antidumping investigation of vector supercomputers from Japan;

6. Assistant Secretary Mr. Robert La-Russa to respond to written interrogatories addressing (a) his receipt of outcome directives, (b) any constraints placed upon him by the predecisional memorandum, (c) the extent to which decisions in the Supercomputer Investigation will be made by him, and (d) any involvement he had in the deliberations concerning the predecisional memorandum between May 20, 1996 and June 5, 1996;

7. Mr. Christian Marsh to respond to a written interrogatory addressing any directives he has received with respect to the outcome of the Supercomputer Investigation.

Paul, Weiss, Rifkind, Wharton, & Garrison (Robert E. Montgomery, Jr., Terence J. Fortune, Robert P. Parker, David J. Weiler). Washington, DC, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Jeffrey M. Telep, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Lucius B. Lau, Attorney–Advisor, Washington, DC, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for Defendants.

Wilmer, Cutler & Pickering (John D. Greenwald, Stuart M. Weiser), Washington, DC, for Defendant–Intervenor.

## ORDER GOVERNING DISCOVERY

POGUE, Judge.

The defendants are hereby ordered to produce the following, **on or before 10:00 A.M., Tuesday, Feb. 18, 1997:**

1. For *in camera* review: all documents that concern or relate to the Department's predecisional memorandum or to a commitment to a particular outcome with respect to the dumping of

## BACKGROUND

This action arises from an antidumping investigation initiated by the United States Department of Commerce (Commerce) on August 20, 1996. The investigation was initiated in response to a petition filed by Cray Research, Inc. (Cray) on July 29, 1996 alleg-

ing that NEC Corporation and HNSX Supercomputers, Inc., a wholly owned American subsidiary of NEC, had offered to sell four SX–4 supercomputers to the University Corporation for Atmospheric Research (UCAR) at a price that was less than fair value. Both Cray and NEC had submitted bids in response to a request for proposals issued by UCAR in March 1995 seeking high performance computing equipment. UCAR, a non-profit corporation, is funded in large part by the National Science Foundation (NSF), an agency of the United States government.

Plaintiffs commenced this suit on October 15, 1996 to enjoin continuation of the antidumping investigation,[1] claiming that Commerce had impermissibly prejudged the issues presented by Cray's antidumping petition. Specifically, NEC alleged that "Commerce is biased and has prejudged Cray's dumping allegations," and that "Commerce determined as a matter of institutional policy to block UCAR's procurement of NEC supercomputers, and thereafter engaged in a systematic and coordinated effort to implement this policy through misuse of the antidumping laws." (Pls.' Res. to Defs.' Supp. to their Mot. to Dismiss at 4 (Dec. 19, 1996)). As evidence of its prejudgment claim, NEC produced a letter dated May 20, 1996 and signed by Mr. Paul Joffe, then Commerce's Acting Assistant Secretary for Import Administration, to Dr. Neal Lane, Director of the NSF, stating, *inter alia:*

> ... the cost of production of one of the foreign bidders is substantially greater than the funding levels projected by NCAR's request for proposals. In anti-dumping law terms, this means that the "dumping margins," that is, the amount by which the fair value of the merchandise to be supplied exceeds the export price, is likely to be very high.

(Pls.' Ex. D). Mr. Joffe also sent Dr. Lane a document entitled Predecisional Memorandum containing a numerical analysis estimating that NEC's dumping margin would be between 190% and 280%. Although Commerce sent the communications only to the

NSF, both have since been published. *See* Inside U.S. Trade (May 24, 1996 and Sept. 13, 1996)(Pls.' Ex. G). Commerce's Preliminary Determination in the investigation is expected to be published on February 25, 1997.

### NEC's Discovery Requests

On November 12, 1996 plaintiffs filed a request for expedited discovery to which was attached NEC's first request to Commerce and Cray for the production of documents. Specifically, NEC requested *inter alia* "all documents reflecting or relating to": the UCAR Request for Proposals, communication between Commerce and Cray concerning the acquisition of supercomputers, and the antidumping investigation. At that time, NEC also said that it expected to depose "the three key figures the Department has identified as having knowledge of the matters before the Court: Susan Esserman, Paul Joffe, and Christian Marsh." (Mem. in Supp. of Pls.' Proposed Scheduling Order and Request for Expedited Disc. at 18 (Nov. 12, 1996)). The Court ordered the parties to work out a limited discovery schedule pursuant to paragraph 24 of Plaintiffs' complaint (Tr. of Nov. 13, 1996 Tel. Conf. at 23–24), which alleges:

> prior to the May 20, 1996 announcement by UCAR, one or more meetings involving representatives of the National Science Foundation, the Department of Commerce, the Office of Science and Technology Policy, and other agencies of the federal government were convened to discuss UCAR's potential acquisition of a Japanese supercomputer. During these meetings, Commerce representatives repeatedly stated that the NEC supercomputers were being offered to UCAR at less than fair value.

(Compl.¶ 24). When the parties were unable to agree on the appropriate scope of discovery, the Court ordered the government to provide plaintiffs with a list of all interagency meetings discussing the UCAR acquisition, involving "decision-makers and perhaps one level below the assistant secretary, ... that have discussed the UCAR acquisition...."

---

**1.** On November 5, the Court notified the parties that it intended to consolidate the trial of NEC's action on the merits with the hearing on plaintiffs' application for a preliminary injunction.

The court also asked the defendant to identify all participants in those meetings. (Tr. of Nov. 21, 1996 Tel. Conf. at 31–32). Defendants served their response on November 27, 1996, identifying five such meetings involving 21 Commerce officials and representatives of eight other agencies.

On December 6, 1996, defendants submitted a Supplement to their Motion to Dismiss claiming that plaintiffs' case had been rendered moot because all of the agency officials who had been involved with the events leading up to the preparation and dissemination of the Predecisional Memorandum had moved into new positions, and would therefore not be involved with the investigation of vector supercomputers from Japan. (Defs.' Supp. to Their Mot. to Dismiss at 6–7 (Dec. 6, 1996)). Attached to the Supplement were declarations from Mr. Eizenstat, Ms. Esserman, and Mr. Joffe all stating that they would not be the decisionmaker in the supercomputer investigation and a declaration from Mr. LaRussa stating that he was the decisionmaker in antidumping duty proceedings and that he had no involvement in interagency meetings or other events leading up to the preparation of the May 20, 1996 letter to the National Science Foundation.

On Dec. 23, 1996, the Court ordered the parties to prepare stipulations concerning the Department of Commerce's antidumping administrative process together with the tenure of certain Commerce Department officials in their current and past positions. (Tr. of Dec. 23, 1996 Tel. Conf. at 18–19). The Parties filed their lists and accompanying comments on January 7, 1997.

On January 2, 1997 plaintiffs again submitted a request for documents relating "directly or indirectly" to meetings that took place prior to May 20, 1996, convened to discuss UCAR's acquisition of a supercomputer; documents concerning the briefing received by Under Secretary Eizenstat from Acting Assistant Secretary Robert LaRussa; and other documents relating to Commerce's position with respect to the UCAR acquisition or the antidumping investigation. (Pls.' Third Req. to the Dep't of Commerce for Prod. of Docs. at 4–5 (Jan. 2, 1997)). Plaintiffs also noticed depositions of Mr. Stuart Eizenstat,

Under Secretary of Commerce for International Trade; Mr. Christian Marsh, Director of Accounting; Ms. Susan Esserman, Acting General Counsel for the Department of Commerce; Mr. Robert LaRussa, Acting Assistant Secretary for Import Administration; Mr. Gary Taverman, Director for Enforcement Group Two; and Mr. Paul Joffe, Deputy General Counsel. (Pls.' Notices of Deps. (Jan. 2, 1997)).

The Court ordered the parties to "work through" the question of deposing Mr. Eizenstat, Ms. Esserman and Mr. Joffe. The Court also ordered the parties to work through the question of providing non-deliberative and non-preliminary materials to plaintiffs. (Tr. of Jan. 8, 1997 Tel. Conf. at 42).

On January 13, 1997, plaintiffs filed a request for additional discovery seeking to depose Mr. LaRussa, Mr. Marsh, Mr. Taverman, and Senior Import Compliance Specialist Mr. Edward Easton. (Pls.' Req. for Add. Disc. at 1–2 (Jan. 13, 1997)). On January 15, 1997, the Court ordered discovery of "all documents that concern or relate to the Department's predecisional memorandum or to a commitment to a particular outcome with respect to the dumping of vector super-computers produced in Japan," and of Mr. LaRussa and Mr. Marsh on written interrogatories. (Tr. of Jan. 15, 1997 Tel. Conf. at 12, 60). On Jan. 17, 1997, plaintiffs filed a motion for additional discovery to expand the range of discoverable documents and to permit oral depositions of Robert LaRussa and Christian Marsh. (Pls.' Mot. for Add. Disc. (Jan. 17, 1997)).

Because of the impending Preliminary Determination, this matter was originally scheduled for trial on February 6, 1997. That date was postponed to February 10, 1997 to allow further deliberation of defendants' objections to plaintiffs' discovery requests.

On January 24, 1997, the Court of Appeals for the Federal Circuit stayed proceedings pending its determination of the defendants' writ of mandamus, seeking, *inter alia*, to quash this Court's discovery order. The Federal Circuit denied the application for the

writ, and lifted the stay on February 11, 1997.

## DISCUSSION

### I. THE CAUSE OF ACTION:

■ In ruling on defendants' Motion to Dismiss, this Court held that the law recognizes a claim for prejudgment. *NEC Corporation v. United States,* Court No. 96–10–02360 (Mem. Op. and Order, Dec. 18, 1996);[2] *see Cinderella Career and Finishing Schools, Inc. v. FTC,* 425 F.2d 583, 591 (D.C.Cir.1970)(*Cinderella II* ) (remanding a decision by the Federal Trade Commission, on the ground that the Chairman of the Commission had impermissibly prejudged the case), *Texaco, Inc. v. FTC,* 336 F.2d 754 (D.C.Cir.1964), *vacated and remanded on other grounds,* 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714 (1965); *see also Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975) ("Various situations have been identified in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable. ") (footnotes omitted).

■ To prevail on a prejudgment claim, a plaintiff must overcome the presumption of honesty and integrity in the administrative decision maker,[3] and show that the decisionmaker has an "irrevocably closed" mind on the subject of the investigation. *FTC v. Cement Inst.,* 333 U.S. 683, 701, 68 S.Ct. 793, 803–04, 92 L.Ed. 1010 (1948).[4]

■ A public position on a policy issue is not disqualifying; nor is prior knowledge of adjudicative facts. *See Hortonville Joint School Dist. No. 1 v. Hortonville Education*

*Assn.,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976). Furthermore, a general claim of agency viewpoint or policy bias is not actionable. *See, e.g. FTC v. Cinderella Career & Finishing Schools, Inc.,* 404 F.2d 1308, 1315 (D.C.Cir.1968) (*Cinderella I* ), (refusing to enjoin Federal Trade Commission from conducting hearing on plaintiff's alleged unfair trade practices notwithstanding the Commission's pre-hearing issuance of a press release stating the Commission had found "reason to believe" that the law had been violated). *See also Withrow,* 421 U.S. at 58, 95 S.Ct. at 1470 ("The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation."). Thus, in making out its claim for prejudgment, it is not enough for plaintiffs to show that Commerce officials had formed opinions on whether NEC's supercomputers were being dumped. The antidumping statute contemplates that a decisionmaker will make up its mind over the course of the administrative process, starting from a viewpoint at the initiation of the investigation, e.g.—"there may be dumping," and leading to a conclusion upon issuance of the final determination, e.g.—"there is dumping," or "there is no dumping."

■ The actionable claim is an advance commitment about the outcome of a dumping investigation, resulting from either an irrevocably closed mind, *FTC v. Cement Inst.,* 333 U.S. at 701, 68 S.Ct. at 803–04, or an inappropriate influence that undermines the decisionmaker's decisional independence. *See Ass'n of Administrative Law Judges v.*

---

**2.** Defendants did not move for a rehearing of the Court's order denying the motion to dismiss, *see* 28 U.S.C. § 2646 (1994), nor did defendants make application for an interlocutory appeal to the Court of Appeals of the Federal Circuit. *See* 28 U.S.C. § 1292(d)(1)(1994).

**3.** *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464 ("The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; ...")

**4.** In *FTC v. Cement Inst.* the Court refused to disqualify the FTC from an antitrust investigation even though members of the FTC had testified before Congress that they believed that the conduct under investigation constituted illegal price fixing. The Court explained, "[T]he fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were *irrevocably closed* on the subject...." 333 U.S. at 701, 68 S.Ct. at 803.

*Heckler,* 594 F.Supp. 1132, 1143 (1984)("Defendants' insensitivity to that degree of decisional independence the APA affords to administrative law judges ... could have tended to corrupt the ability of administrative law judges to exercise that independence in the vital cases that they decide.")

In *Cinderella II,* 425 F.2d at 590, the Court held that the Chairman of the FTC should have recused himself from an administrative hearing after he made statements before members of the National Newspaper Association that gave the appearance "that the case has been prejudged." According to the Court,

> Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems. it necessary to do so after consideration of the record. There is a marked difference between the issuance of a press release which states that the Commission has filed a complaint because it has 'reason to believe' that there have been violations, and statements by a Commissioner after an appeal has been filed which give the appearance that he has already prejudged the case and will move in predestined grooves.

*Id.* Similarly, in *Texaco,* 336 F.2d at 760, the Court found that the Chairman of the FTC should have recused himself from an administrative hearing after he made a speech that "plainly reveals that he had already concluded that [plaintiffs] were violating the [Federal Trade Commission Act]." *Id. See also, American Cyanamid v. FTC,* 363 F.2d 757 (6th Cir.1966) (remanding administrative decision of FTC and disqualifying the Chairman of the Commission because as Chief Counsel to a Senate subcommittee, the Chairman had investigated and developed many of the factual determinations upon which the Commission's order was based, and therefore, his participation "amounted to a denial of due process.") (citations omitted).

In this case, plaintiffs have alleged that during meetings on the UCAR procurement, "Commerce representatives repeatedly stated that the NEC supercomputers were being offered to UCAR at less than fair value." (Pls.' Resp. to Defs.' Supp. to their Mot. to Dismiss at 6 (Dec. 19, 1996)). Plaintiffs also produced the May 20th letter of Mr. Paul Joffe and the Predecisional Memorandum, which contains a calculated dumping margin and was made available to NSF and the public at large. Plaintiffs' allegations, together with the letter and memorandum are sufficient to state a claim. Given this factual record, the Court cannot rule as a matter of law that Plaintiffs are unable to prove their claim of prejudgment.

## II. DISCOVERY

In their opposition to plaintiffs' request for additional discovery, filed with the Court on January 14, 1997, defendants object to the discovery of Mr. Eizenstat, Ms. Esserman, Mr. Joffe, and Mr. LaRussa *in toto* because the requisite "exceptional circumstances" do not exist to justify involuntary depositions of high ranking executive department officials. *See In re FDIC,* 58 F.3d 1055, 1060 (5th Cir.1995). The interposition of this objection in the January 14 submission surprised the Court. Prior to that time, and based on the representations of defendants' counsel, the Court was unaware that discovery of the aforementioned persons would be involuntary. During the January 8, 1997 telephone conference, when the scope of discovery was discussed, defendants' counsel did not inform the Court that any discovery of Mr. Eizenstat would be involuntary and, by extension, require "exceptional circumstances." Defendants' counsel instead proposed to limit "any discovery of Mr. Eizenstat" by having it "reduced to a deposition on written questions," and added that "[t]here is a plethora of case law on point on the ability of a senior government official to have discovery taken in the least intrusive manner possible, and we believe that our proposal is consistent with normal procedure." (Tr. of Jan. 8, 1997 Tel. Conf. at 34–35.) When the Court ordered the oral depositions of the relevant Commerce officials, (Tr. of Jan.8, 1997 Tel. Conf. at 42), it did so with the belief that the depositions would be voluntary.

In any event, the defendants' litigation posture on discovery is considerably different

from the Court's initial impression, which appears to have been incorrect, and raises the issue of whether the circumstances of the instant case present "exceptional circumstances" to warrant the involuntary deposition of high ranking Commerce Department Officials.

This issue is further complicated by the defendants' conflation of two other administrative law principles with the rule governing discovery of high ranking officials: the presumption of "good faith" or "regularity" enjoyed by government officials,[5] and the rule that "where there are *administrative findings* at the same time as [a challenged] decision, ..., there must be a strong showing of bad faith or improper behavior" before testimony of administrative officials is required. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971)(emphasis added).

### A. PRESUMPTION OF GOOD FAITH/STRONG SHOWING OF BAD FAITH

The defendants argue that plaintiffs must produce "well-nigh irrefragable proof" to overcome the presumption of good faith that applies to government officials before discovery of those officials is warranted. (Defs.' Resp. To Pls.' Mot. for Add. Disc. at 2 (Jan.

23, 1997)) (citations omitted). Defendants also argue that plaintiffs must simultaneously make a strong showing of bad faith on the part of defendants before discovery is warranted. Neither standard is applicable to plaintiffs' discovery requests in this case.

■ When it applies, the presumption of good faith defines the substantive evidentiary standard, (the burden of proof), on the merits of a given case. *See, e.g. Kalvar Corp., Inc. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1300 (1976)(raising presumption of good faith and requiring "well-nigh irrefragable proof to induce the court to abandon the presumption of good faith" *in deciding the merits of plaintiff's claim* ); *Knotts v. United States,* 128 Ct.Cl. 489, 121 F.Supp. 630, 631 (Ct.Cl.1954) (stating that in personnel disputes, the court "starts out with presumption that official acted in good faith," and that it takes "well-nigh irrefragable proof" for the court to find otherwise. The court held that plaintiff, *on the merits,* had in fact produced well-nigh irrefragable proof of discharge because of bad faith, personal animus.). The presumption of good faith is irrelevant here where the Court has not yet reached the merits and is deciding whether or not discovery is warranted. The presumption of good ·

---

**5.** It is unclear whether Rule 301 of the Federal Rules of Evidence applies to the presumption of good faith dealing enjoyed by government officials, *see, e.g., Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977); *Knotts v. United States* 128 Ct.Cl. 489, 121 F.Supp. 630, 631 (1954), or the presumption of legality and regularity of action enjoyed by governmental officials generally, *see, e.g., United States v. Roses Inc.,* 706 F.2d 1563, 1566–67, (Fed.Cir.1983). Wright and Miller note:

Rule 301 does not apply to "assumptions"; that is, rules for allocating the burden of proof. Although often called "presumptions," an assumption does not meet the present definition since it does not depend on the establishment of any basic fact. The classic example is the so-called "presumption" of innocence; it does not arise from the proof of any fact by the defendant but is simply a misleading way of stating that the burden of proof is on the prosecution to prove the defendant guilty. Other examples of assumptions are the assumption of intent, the assumption of sanity, *the assumption that official duty has been performed,* the assumption that counsel is compe-

tent and the assumption that the deficiency notice is accurate in tax cases. Since courts sometimes treat these assumptions as if they were true presumptions, it is not always a simple matter to determine whether a device is an assumption or a presumption. Usually, however, *one can conclude that an assumption is involved when the effect of the so-called "presumption" does not depend on the proof of any fact by the person in whose favor it operates, or the "presumption" operates against the party who would normally have the burden of proof on the issue,* or the effect of the "presumption" is to "shift" the burden of proof.... If the device is an assumption rather than a presumption, then Rule 301 does not apply.

21 CHARLES ALAN WRIGHT & ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 5124 at 31,440 (Footnotes omitted). *But see* 2 McCORMICK ON EVIDENCE § 343 at 455 (4th ed.1992). Applying the "assumption" formulation of Wright & Miller to the presumptions in question, it appears that neither the presumption of good faith nor the presumption of regularity depend on the proof of any fact by the government official in whose favor they operate, and additionally, both presumptions operate against the party who normally has the burden of proof on the issue.

faith cannot "shield [the agency's] action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Sound reasons support this conclusion: If the Court were to apply the presumption of good faith, and require "well-nigh irrefragable proof" of the claim before allowing discovery, plaintiffs would be prevented from gathering the evidence needed to prove their claim of prejudgment—effectively negating their cause of action. Such a result is inconsistent with the spirit and purpose of Rule 26 of the Federal Rules of Civil Procedure. *See Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). *See generally* 4 MOORE'S FEDERAL PRACTICE ¶ 26.02 at 26–80–82 (1994).

■ In addition to the presumption of good faith, defendants simultaneously invoke the rule that before testimony of administrative officials may be required, "there must be a strong showing of bad faith or improper behavior" *where there are administrative findings at the same time as a challenged decision. Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26. This rule, however, is separate and distinct from the presumption of good faith, and like the presumption of good faith, is not applicable to plaintiffs' discovery requests in this case.

Here there is neither an administrative record nor formal administrative findings. Therefore, the discovery contemplated by the Court does not involve extra-record evidence requiring a strong showing of bad faith. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26 ("... here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.").

Unlike *Overton Park*, the cases cited by defendants requiring a showing of bad faith involved judicial review of decisions based on an administrative record. In such cases, courts require a showing of bad faith before allowing discovery of information beyond the administrative record. For example, in *Mullins v. United States Department of Energy*, 50 F.3d 990 (Fed.Cir.1995), plaintiffs sought a declaratory judgment that the Department of Energy had erred in its settlement of a lawsuit. Plaintiffs argued that the agency's

decision was not supported by substantial evidence in the record. Although the *Mullins* court agreed that the agency explanation for its action was conclusory, it was on an administrative record. The court, therefore, refused to remand the decision or require the government to provide a better explanation of its actions "[a]bsent some showing of fraud or clear wrongdoing." *Id.* at 993.

In *Spezzaferro v. Federal Aviation Administration*, 807 F.2d 169 (Fed.Cir.1986), petitioners challenged the *FAA's* denial of numerous discovery requests. The Merit System Protection Board (MSPB) found that the requested documents would have shed no light on the ultimate issue in the administrative proceeding—the FAA's method of calculating overtime. The Court refused to overturn or remand the MSPB's denial of petitioners' discovery requests, explaining:

> In procedural matters such as discovery or an attempt to reopen a record, as here, the discretion accorded to the board and its officials must be shown to have been abused. That is not established here nor has bad faith by the agency been shown. We do not decide what this court would have done on the discovery issue had it been trying the case.

*Id.* at 173. The *Spezzaferro* court reviewed a discretionary decision by an administrative agency to deny discovery. *Id.* The court evaluated whether the agency had abused its discretion in refusing plaintiff's discovery request and concluded that it had not. *Id.* The court added that plaintiffs' challenge to the denial of their discovery request had failed to overcome the presumption of good faith that applies to the decisions of a government agency. *Id. Spezzaferro* is not controlling in the case before the Court. Here the Court is defining the scope of discovery in the first instance. Also, here there is neither an administrative record nor formal administrative findings.

Defendants are aware of this difference. In their response to plaintiffs' request for additional discovery, defendants state, "Of course plaintiffs would contend that they need not make such a showing [of bad faith] in the absence of a formal administrative record and that discovery is appropriate to

ascertain the path of the agency's decision-making process." Rather than answering that imputed argument, however, defendants simply state that "[p]laintiff should not be able to rely on this argument as the basis for discovery when their own actions precluded Commerce from compiling a formal administrative record out of the investigation." Commerce's statement is not responsive to the posture of this litigation. This Court has already held that the prejudgment claim was appropriately brought prior to completion of Commerce's antidumping investigation. *See NEC Corp. v. United States,* Court No. 96–10–02360 (Mem. Op. and Order at 3, Dec. 18, 1996); *see also Barry v. Barchi,* 443 U.S. 55, 63 n. 10, 99 S.Ct. 2642, 2648, 61 L.Ed.2d 365 (1979)(Under existing authority, exhaustion of administrative remedies is not required when "the question of the adequacy of the administrative remedy ... [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.")(quoting *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)); *McCarthy v. Madigan,* 503 U.S. 140, 148, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992)(stating that exhaustion of administrative remedies may not be required "where the administrative body is shown to be biased or has otherwise predetermined the issue before it.").

▪ For these reasons, the defendants' all encompassing objection to discovery of any kind must fail. If material sought to be discovered is not privileged and "is relevant to the subject matter involved in the pending action,"[6] the burden of proof is on the party seeking protection from discovery, even if that party is the government. "[A]bsent a compelling reason for nondisclosure, the United States is bound by the Federal Rules of Civil Procedure just as any litigant." *NAACP v. Hodgson,* 57 F.R.D. 81 (D.D.C. 1972). In *NAACP,* the plaintiffs sought to

depose three Department of Labor employees. The defendant moved for a protective order postponing all discovery until after the court had disposed of its motion to dismiss or, in the alternative, for summary judgment. Defendants asserted that to allow discovery to proceed prior to the disposition of the motion, "would be to place an undue burden upon defendants in terms of the time required for the government officials to prepare for the depositions, to answer the interrogatories, to examine documents to determine which would fall within the requests of the plaintiffs, and to actually attend the depositions." *Id.* at 82. The Court refused to issue the protective order, agreeing with plaintiffs that "by moving for summary judgment and simultaneously seeking to stay discovery of matters peculiarly within the defendants' knowledge, the defendants seek to deny plaintiffs' access to the very evidence needed to counter fully the motion." *Id.* at 83. Furthermore, the Court found the defendants had demonstrated no compelling reasons for nondisclosure. So too in this case, any substantive harm claimed by the government[7] can be minimized by appropriately tailoring the Court's order.

### B. DEPOSITION OF HIGH-RANKING GOVERNMENT OFFICIALS

Defendants raise an additional objection to the questioning, either on oral deposition or written interrogatories, of Mr. Eizenstat, Ms. Esserman, Mr. Joffe, and Mr. LaRussa, claiming that "exceptional circumstances" do not exist to justify involuntary depositions of high ranking executive department officials. (Opp. to Pls' Request for Add. Disc. (Jan. 14, 1997)) ( citing *inter alia In re FDIC,* 58 F.3d 1055, 1060 (5th Cir.1995)).

▪ "[E]xceptional circumstances must exist before the involuntary depositions of high agency officials are permitted," *In re*

---

6. *See* USCIT R. 26

7. According to defendants' counsel, "the harm is .... [f]irst of all with respect to our jurisdictional argument, we believe that the Court has improperly intruded into the administrative—the executive branch function of an ongoing administrative proceeding. Secondly, it probes—the Court's order will allow the plaintiffs to probe the deliberative processes of the Government through both written responses to interrogatories, document production, and ultimately depositions of senior Government officials. And thirdly, as the case law is perhaps most strong, the Government will be harmed by forcing senior Government officials, including the Acting Secretary of Commerce, to sit for depositions." (Tr. of Jan. 24, 1997 Tel. Conf. at 10).

*Office of Inspector General,* 933 F.2d 276, 278 (5th Cir.1991) and "the practice of calling high officials as witnesses should be discouraged." *See In re United States of America,* 985 F.2d 510, 512 (11th Cir.1993) (citing *United States v. Morgan,* 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429). On the other hand, in a case in which there are no formal administrative findings, "it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves." *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26.

▪▪▪ "In general, high ranking government officials enjoy limited immunity from being deposed in matters about which *they have no personal knowledge.* ... Before the involuntary depositions of high ranking government officials will be permitted, the party seeking the depositions must demonstrate that the particular official's testimony will likely lead to the discovery of admissible evidence and is essential to that party's case." *Warzon v. Drew,* 155 F.R.D. 183, 185 (E.D.Wis.1994) (citing *Sweeney v. Bond,* 669 F.2d 542, 546 (8th Cir.1982))(emphasis added). In addition, "the evidence must not be available through an alternative source or via less burdensome means." *Id.*

In *Pension Benefit Guar. Corp. v. LTV Steel Corp.,* 119 F.R.D. 339 (S.D.N.Y.1988) the court permitted the defendant to examine the Executive Director of a government agency based on its "narrow, albeit serious charge that the PBGC exercised its statutory authority under ERISA for an improper purpose." 119 F.R.D. at 334. *See also Marine Shale Processors, Inc. v. Environmental Prot. Agency,* 81 F.3d 1371, 1384 (5th Cir.1996)(implicitly allowing depositions from an agency official, the Director of EPA Region VI's Hazardous Waste Management Division, after plaintiffs said that he had prejudged certain key issues of plaintiffs' case. The court stated, "In his depositions, Dr. Davis repeatedly testified that he had not prejudged issues,....").

The Court believes that this case, like *LTV,* warrants some limited discovery of high ranking Commerce Department officials in the form of depositions from Mr. Eizenstat, Ms. Esserman, and Mr. Joffe and written interrogatories from Mr. LaRussa as set forth above.

▪▪▪ In this case, Mr. LaRussa is the decisionmaker responsible for the outcome of the Supercomputer Investigation. Mr. Eizenstat is Mr. LaRussa's superior. Mr. Eizenstat has had personal involvement with this investigation. He has attended meetings on the supercomputer matter prior to the initiation of the antidumping investigation, and he has received briefings from Mr. LaRussa on the progress of the investigation. *See* Eizenstat Decl. at ¶ 5. Furthermore, Mr. Eizenstat's alleged commitment to the outcome of the antidumping investigation is pivotal to plaintiffs' claim of prejudgment. Plaintiffs must show that Mr. Eizenstat has impermissibly interfered with Mr. LaRussa's decisional independence. The substantive evidentiary standard in a claim for prejudgment imposes a heavy burden. Plaintiffs must establish that the decisionmaker, presumed to be a person of honesty and integrity, has an irrevocably closed mind on the dumping investigation. As the Court noted earlier, this question cannot be resolved as a matter of law—it depends on facts that are still in dispute. The person who can address the central factual question, on which the plaintiffs have the burden of proof, is Mr. Eizenstat. Thus it is clear that this is the kind of situation contemplated by *Overton Park,* in which effective judicial review would be impossible without the testimony of the agency decisionmakers.

This case differs from *In re United States,* 985 F.2d 510 (11th Cir.1993), in which David Kessler, head of the Food and Drug Administration, was asked to testify in a selective prosecution case. In that case, Dr. Kessler did not assume the office of Commissioner until four years after the initial investigation upon which the case was based. Therefore, the court said, "he could not have been responsible for selectively prosecuting the defendant." 985 F.2d at 512–513 (11th Cir. 1993). Furthermore, the Court found that the information sought was available from alternative witnesses. *Id.*

This case also differs from *In re FDIC,* 58 F.3d 1055 (5th Cir.1995). As an initial mat-

ter, the party seeking discovery in *FDIC*, Pacific Union, was challenging an administrative action supported by an administrative record.[8] To get discovery beyond the agency record, Pacific Union would have to have shown bad faith or improper behavior on the part of the agency. The Court found that Pacific Union had failed to make such a showing. *Id.* at 1062. Furthermore, the Court said that even if Pacific Union found evidence of political influence by government officials from other agencies, such evidence would not establish "the required degree of bad faith or improper behavior." *Id.* The Court said the agency heads' consideration of other government officials' preferences would not be improper. In other words, agency officials are allowed to consider the preferences and advice of officials from other agencies. Thus, the testimony sought by Pacific Union would not have been likely to lead to the discovery of admissible evidence. In the case currently before the Court, on the other hand, the alleged influence upon the decisionmaker comes from a superior official within the chain of command of the agency making the decision. It is this top down influence that is potentially impermissible. *See Association of Administrative Law Judges v. Heckler*, 594 F.Supp. 1132, 1143 (1984).

Finally, the Court in *FDIC* found that the Directors Pacific Union wanted to depose were not the actual decisionmakers, and that Pacific Union had an alternative source for the information it sought. *Id.*

Unlike *FDIC*, here plaintiffs have offered evidence in support of their claim of prejudgment. That showing, together with the impending deadline for the Department's Preliminary Determination, the lack of alternate sources of testimony, and the absence of an administrative record create the exceptional circumstances necessitating discovery of high ranking government officials.

■ At the same time, the Court is aware that due to his rank, Mr. Eizenstat is subject to serious time constraints. Furthermore, Mr. Eizenstat only participated in one of the interagency meetings listed in the government's response to Court-ordered discovery of Nov. 27, 1996. For these reasons, the Court has decided to limit the deposition of Mr. Eizenstat to a deposition upon written questions. *See* USCIT R. 31.

■ The arguments supporting depositions of Susan Esserman and Paul Joffe are also strong. As Assistant Secretary for Import Administration, Ms. Esserman was responsible for the administration of and policy relating to the United States antidumping and countervailing duty laws. (Decl. of Susan Esserman at ¶ 3). Ms. Esserman has personal knowledge of facts concerning Import Administration's activities leading up to the Supercomputer Investigation. (Esserman Declaration ¶ 5). It was Ms. Esserman who ordered the preparation of the dumping analysis, which was distributed over the signature of Paul Joffe, then Acting Assistant Secretary, who sent the analysis to the NSF. These activities are central to NEC's prejudgment claim.

Finally, only Mr. LaRussa can testify to the amount of pressure, if any, he may feel to reach a certain outcome in the Supercomputer Investigation. Therefore, the Court believes it is appropriate and necessary that NEC be allowed to direct a written interrogatory to Mr. LaRussa on this point, without inquiring into Mr. LaRussa's deliberations or personal opinions as to the existence of dumping, or the current status of the antidumping investigation. Unlike Mr. Eizenstat, Ms. Esserman and Mr. Joffe, Mr. LaRussa had no involvement in the activities leading up to the preparation of the Predecisional Memorandum. As he is conducting the investigation, it is particularly important to respect his deliberative process and protect that process from undue interference.

---

**8.** *See FDIC*, 58 F.3d at 1058 ("FDIC's Board of Directors formally approved a staff proposal that the FDIC Division of Resolutions be permitted to exercise its discretion ... to direct that First Heights sell Playa del Rio to the United States Fish & Wildlife Service.... The Board adopted a resolution that ... explained that Playa del Rio included substantial wetlands and represented a valuable natural resource and critical habitat to several endangered species.... The Board found that the sale would permit the recovery of significant economic value for Playa del Rio....").

The Court's order does not permit the plaintiffs to delve into matters not relevant to this proceeding. The issue here is whether the responsible decisionmaker has prejudged the outcome of the investigation or is so constrained as to preclude his decisional independence. The Department's motives in developing its predecisional memorandum are irrelevant. The question is whether that memorandum, in this context, indicates such a commitment to a specific outcome as to render the investigation constitutionally infirm. The Court must allow discovery of evidence relevant to this narrow question.

## III. PRIVILEGE

The defendants have not asserted any governmental privilege. The Court, however, believes that the scope of discovery defined by this order properly protects the interests served by the privilege, while allowing NEC adequate access to information that is or may lead to facts material to its cause of action.

■■■ The executive privilege is meant to protect the communications that form part of the government's decision-making process. "[I]t is well established that the privilege obtains with respect to intra-governmental documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena* 40 F.R.D. 318, 324 (D.D.C.1966). "The judiciary, ... is not authorized 'to probe the mental processes' of an executive or administrative officer," *Id.* at 325 (quoting *Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 999, 82 L.Ed. 1129 (1938)).

■■■ In this case, with regard to Commerce career staff, the Court is allowing discovery only of Christian Marsh and solely on the question of directives he has received from superiors with respect to the outcome of the supercomputer investigation. The Court is permitting NEC to gather evidence on the limited question of whether Mr. Marsh has received inappropriate influence from above. The Court is not permitting Mr. Marsh to be questioned as to his own opinion regarding the investigation or his communication of this opinion to his superiors. Not only does this protect the agency's deliberative process, it is appropriate because Mr. Marsh's independently formed opinions are not relevant to NEC's cause of action. Import Administration staff must form and communicate opinions to their superiors as part of their official, statutorily authorized responsibilities. These opinions cannot, as a matter of law, lead to the conclusion that the mind of the decisionmaker is irrevocably closed, nor can they indicate bad faith on the part of the agency. *Corning Savings & Loan Assn. v. Federal Home Loan Bank Board*, 571 F.Supp. 396, 404 (E.D.Ark.1983), *aff'd*, 736 F.2d 479 (8th Cir. 1984) ("[s]ince the agent is not the final decisionmaker, any bias on his part does not taint the ultimate, independent decision of the Board").

Similarly, the documents the Court is requiring are non-deliberative in nature and outside the scope of any statutorily authorized documents relating to the investigation itself. In particular, the Court has not required any documents communicating the opinions or advice of Import Administration staff to Commerce officials. Such documents would, by definition, be irrelevant to NEC's prejudgment claim. Also, requiring the production of such documents would certainly interfere with the agency's authorized deliberative process.

## IV. TIMING

The Court is ordering all documents to be delivered for *in camera* review, and agency staff and officials to be made available for deposition by February 24, 1997. Time is of the essence in this matter because the Department is expected to publish its Preliminary Determination on February 25, 1997.

**SO ORDERED.**