**Slip Op. 03-17**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| | **:** | |
| **HONTEX ENTERPRISES, INC.,** | **:** | |
| **d/b/a/ LOUISIANA PACKING CO.,** | **:** | |
| | **:** | |
| Plaintiff, | **:** | Before: Eaton, Judge |
| | **:** | |
| v. | **:** | **Court No. 00-00223** |
| | **:** | |
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| Defendant, | **:** | |
| | **:** | |
| and | **:** | |
| | **:** | |
| **CRAWFISH PROCESSORS ALLIANCE &** | **:** | |
| **THE LOUISIANA DEPARTMENT OF** | **:** | |
| **AGRICULTURE & FORESTRY &** | **:** | |
| **BOB ODOM, COMMISSIONER,** | **:** | |
| | **:** | |
| Defendant-Intervenors. | **:** | |
| | **:** | |

_____

[Antidumping determination remanded to Commerce.]

February 13, 2003

Coudert Brothers LLP (John M. Gurley and Matthew J. McConkey) for Plaintiff Hontex Enterprises, Inc.

Robert D. McCallum, Jr., Assistant Attorney General, Civil Division, United States Department of Justice; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Lucius B. Lau, Assistant Director, International Trade Section, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeffrey A. Belkin); Arthur D. Sidney, of counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant United States.

Adduci, Mastriani & Schaumberg, L.L.P. (James Taylor, Jr.), John C. Steinberger, of counsel, for Defendant-Intervenors Crawfish Processors Alliance and the Louisiana Department of Agriculture and Forestry and Bob Odom, Commissioner.

## OPINION AND ORDER

EATON, Judge.  This matter is before the court on the motion of Plaintiff Hontex Enterprises, Inc. ("Hontex")[1] for judgment upon the agency record pursuant to USCIT R. 56.2.  Hontex challenges certain aspects of the first administrative review of the antidumping duty order, with respect to exporter Ningbo Nanlian Frozen Foods Company, Ltd. ("NNL"),[2] covering its imports of freshwater crawfish tail meat from the People's Republic of China ("PRC") for the period of April 1, 1998, through August 31, 1998.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(i)(I) (2000).  Where a party challenges the results of an antidumping administrative review, the "court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).  For the reasons set forth below, the court remands this matter to United States Department of Commerce (the "Department" or "Commerce") with instructions to conduct further proceedings in conformity with this opinion.

---

[1]    As a domestic importer of the subject merchandise Hontex is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A) entitled to challenge the United States Department of Commerce's determination pursuant to 19 U.S.C. § 1516a(a)(2).  In addition to being an importer, Hontex is also part-owner of Ningbo Nanlian Frozen Foods Company, Ltd., an export trading company created in 1998, that sold Hontex subject merchandise during 1998.

[2]    Throughout its papers Hontex refers to NNL as "Plaintiff" in this action.  The Complaint, however, lists only Hontex as "Plaintiff."  While it is undisputed that Hontex is a co-owner of NNL, the court understands Hontex's use of the term "Plaintiff," as it relates to NNL, to indicate that NNL was subject to the administrative review here at issue.  Furthermore, while it may be that Hontex was acting on NNL's behalf during the course of the instant review, as it was NNL—and not Hontex—that was investigated by Commerce, the court understands that any argument as to the propriety of Commerce's actions is limited to NNL.

## BACKGROUND

Commerce conducted its original investigation of the subject merchandise for the period of review of March 1, 1996, through August 31, 1996. See Freshwater Crawfish Tail Meat From the PRC, 62 Fed. Reg. 41,347, 41,347 (ITA Aug. 1, 1997) (final determination). As a result of this investigation, Commerce issued an antidumping order pursuant to which several exporters received company-specific antidumping duty margins, several received "cooperative" margins, and the remainder received the "PRC-wide" duty margin—which was set at 201.63 percent. See id. at 41,358. One of the exporters investigated, which was eventually identified as Huaiyin Foreign Trade Corporation (5) ("HFTC5"), was assigned a company-specific antidumping duty margin of 91.50 percent. See Freshwater Crawfish Tail Meat From the PRC, 65 Fed. Reg. 20,948, 20,949 (ITA Apr. 19, 2000) (final results of admin. rev.; rescission of new shipper rev.) ("Final Results") ("The HFTC entity now known as HFTC5, a.k.a. Huaiyin Cereals and Oils Import and Export Corporation, is the same HFTC entity that was assigned a separate rate in the [less than fair value] investigation.").

On March 27, 1998, NNL requested a new shipper review. See Freshwater Crawfish Tail Meat From the PRC, 63 Fed. Reg. 25,449 (ITA May 8, 1998) (initiation of new shipper rev.). This review covered the period of September 1, 1997 (the anniversary date of the original investigation), through March 31, 1998. Id. at 25,449. Following this review Commerce determined that for this period NNL's antidumping duty margin was 0.0 percent. See Freshwater Crawfish Tail Meat From the PRC, 64 Fed. Reg. 27,961, 27,966 (ITA May 24, 1999) (final results of new shipper rev.).

Commerce then received a petition for administrative review of the antidumping duty order covering the subject merchandise. See Initiation of Antidumping and Countervailing Duty Admin. Rev., 63 Fed. Reg. 58,009 (ITA Oct. 29, 1998) (requests for revocation in part and deferral of admin. revs.). In its notice of initiation, Commerce identified HFTC5 and NNL (the "Companies") as exporters covered by the review. See id. at 58,010. The period of review ("POR") was generally identified as March 26, 1997, through August 31, 1998, id.; because NNL had participated in a new shipper review, however, NNL's POR was identified as April 1, 1998, through August 31, 1998 ("NNL's POR"). Freshwater Crawfish Tail Meat From the PRC, 64 Fed. Reg. 55,236, 55,237 (ITA Oct. 12, 1999) (prelim. results of rev.) ("Preliminary Results").

Commerce then sent antidumping questionnaires to the Companies, responses to which were timely filed. In these responses both NNL and HFTC5 requested company-specific antidumping duty margins and provided evidence of their claimed de jure and de facto independence from government control. In addition, the Companies claimed that they did not share managers or owners, or share common control with other crawfish tail meat exporters. (See NNL Section A Resp., Pub. R. Doc. 19, Attach. at 3; HFTC5 Section A Resp., Pub. R. Doc. 24, Attach. at 4.) Shortly after filing its questionnaire response, HFTC5 informed Commerce that it would not submit to verification. (See letter from law firm of Arent Fox Kintner Plotkin & Khan ("Arent Fox") to Commerce of 5/4/99, Pub. R. Doc. 55.) HFTC5 stated that it was unable to further participate because it "could not persuade [its] suppliers to cooperate." (Letter from Arent Fox to Commerce of 5/21/99, Pub. R. Doc. 56 Attach.)

Commerce then published the preliminary results of its investigation. Based on information submitted by NNL, Commerce determined that NNL had demonstrated its de facto and de jure independence from state control and, thus, NNL was assigned a preliminary company-specific antidumping duty margin of 0.0 percent. Preliminary Results, 64 Fed. Reg. at 55,240, 55,242. Because HFTC5 had contacted Commerce to state that it was refusing verification, Commerce determined that HFTC5 would receive the PRC-wide antidumping duty margin of 201.63 percent. Id. at 55,239, 55,242. In this regard Commerce stated that "[b]ecause [HFTC5] did not allow the Department to verify the information it submitted, we could not use the information. Therefore . . . the use of [facts available] is required . . . ." Id. at 55,238.[3] Commerce also stated that issues of the affiliations among several crawfish tail meat exporters were being investigated. Id. at 55,239 ("We have placed on the record of the new shipper reviews of Baolong Biochemical and Haiwang third party allegations that these companies may

---

[3]     Hontex argues that "the Department's use of a punitive margin for HFTC (5) was unlawful and [i]s unsupported by substantial evidence" because "HFTC (5) cooperated throughout the review by submitting responses to the Department's requests for information." (Pl.'s Mem. at 3.) While it is true that HFTC5 initially "submitted responses" to Commerce's questionnaires, there can be no doubt that HFTC5 did not "cooperate" fully in the instant investigation as it refused verification of those questionnaire responses on more than one occasion. (See letter from Arent Fox to Commerce of 5/4/99, Pub. R. Doc. 55; letter from Arent Fox to Commerce of 5/21/99, Pub. R. Doc. 56 Attach.; Freshwater Crawfish Tail Meat (crawfish) from the PRC Admin. Review, Pub. R. Doc. 187 (attempts to conduct verification at HFTC5).) Because HFTC5 refused verification of its submitted information, Commerce was unable to ascertain whether HFCT5 had rebutted the presumption of state control that attaches in NME investigations such that it was entitled to a separate company-specific antidumping duty margin. See Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) ("[I]t was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control."). Because HFTC5, by its repeated refusals to submit to verification of its questionnaire responses, did not rebut the presumption of state control Commerce was justified in assigning it the PRC-wide rate of 201.63 percent.

be affiliated with companies that exported during the investigation.").

Prior to verification, questions arose as to the relationship between NNL and HFTC5 with respect to possible affiliation. Despite the Companies' representations that they did not share managers, a "Mr. Wei"[4] was listed on NNL's business license as its "Vice G. Manager," and this name also appeared on an HFTC5 sales invoice dated during NNL's POR. (See NNL Section A Resp., Pub. R. Doc. 19, Attach. Ex. 4; HFTC5 Section A Resp., Pub. R. Doc. 24, Attach. Ex. 2.) In order to clarify this relationship, Commerce sent NNL a letter asking it to "explain the contradiction between Ningbo Nanlian's claim [in its original questionnaire response] not to share managers with other Chinese crawfish exporters and the evidence on the record of this review that shows Mr. Wei Wei was a manager at both Ningbo Nanlian and HFTC[5] in 1998." (Letter from Commerce to Arent Fox of 1/12/00, Pub. R. Doc. 141.) NNL responded to this letter and claimed that Mr. Wei was not a manager of HFTC5 during NNL's POR but was, rather, "a part-time independent consultant" to that company since his resignation from HFTC5 on October 26, 1997. (See letter from Arent Fox to Commerce of 1/31/00, Pub. R. Doc. 146 at 4.) NNL also stated that Mr. Wei, during NNL's POR, "was not an officer or manager of Ningbo Nanlian either. He was a consultant." (Id. at 2 n.2.)

Commerce followed up its January 12 letter with a supplemental questionnaire in which it

---

[4]       The person referred to here as "Mr. Wei" is variously identified on the record and in the parties' papers as "Mr. Wei," "Philip Wei," or "Mr. Wei Wei." No party to this action disputes that these various names refer to the same person, and the court will refer to him as Mr. Wei.

asked NNL to provide further facts concerning Mr. Wei's relationship with HFTC5. (See letter from Commerce to Arent Fox of 2/4/00, Pub. R. Doc. 147 Attach.) Specifically, Commerce asked that NNL provide information about payments Mr. Wei received from HFTC5 beginning in June of 1997, as well as information about his business relationship with HFTC5, the services he provided to HFTC5, and the nature of his involvement with HFTC5's customers following his "resignation" from that company on October 26, 1997. (See id.) NNL timely submitted responses to this supplemental questionnaire. (See letter from Arent Fox to Commerce of 2/11/00, Conf. R. Doc. 23 Attach. (question two); letter from Arent Fox to Commerce of 2/17/00, Pub. R. Doc. 169 Attach., Conf. R. Doc. 24 Attach. (question one and questions three through eight).) In these responses NNL provided the following information about HFTC5's relationship with Mr. Wei following his "resignation" from HFTC5: (1) for his services to HFTC5 Mr. Wei received a "commission" rather than a salary; (2) Mr. Wei was not a full-time employee but, rather, "a part-time consultant"; (3) due to his proficiency in English and knowledge of the subject merchandise Mr. Wei had, at the direction of HFTC5's General Manager, translated or drafted documents and telephoned customers, and that, on two occasions, he accompanied HFTC5 employees to trade fairs; and (4) at HFTC5's request, Mr. Wei contacted the United States Customs Service ("Customs") in Beijing to inform it that HFTC5 had received information that other crawfish tail meat exporters were using HFTC5's antidumping rate. (See Conf. R. Doc. 24 Attach. at 1; Pub. R. Doc. 169 Attach. at 2–3.) NNL also stated that Mr. Wei would be available at NNL's verification to answer any questions regarding his role at HFTC5. (Pub. R. Doc. 169 Attach. at 4.)

Commerce then sent the Companies letters informing them of its verification agenda. (See letter from Commerce to Arent Fox of 2/23/00, Pub. R. Doc. 176; letter from Commerce to HFTC5 of 2/23/00, Pub. R. Doc. 175.) Notwithstanding HFTC5's May 4, 1999 letter informing Commerce that it was refusing to submit to verification, Commerce officials attempted to arrange a meeting with HFTC5 officials, but were rebuffed in their efforts to do so. (See Freshwater Crawfish Tail Meat (crawfish) from the PRC Admin. Rev., Pub. R. Doc. 187.)

On February 22, 2000, Commerce officials met with Customs officials in Beijing. (See Freshwater Crawfish Tail Meat (crawfish) from the PRC Admin. Rev., Pub. R. Doc. 191 (Mar. 14, 2000) ("Customs Report").) The purpose of this meeting was "to discuss export licenses, the relationships between various crawfish exporters (including relationships among the various Huaiyin Foreign Trade entities), and communications between Customs and these Huaiyin Foreign Trade entities."[5] (Id at 1.) At this meeting Customs provided information about Mr. Wei's interaction with Customs on behalf of HFTC5 and several documents in which Mr. Wei was identified as HFTC5's "Vice General Manager." (See id., Attach.)

Commerce conducted verification of NNL's responses on March 2 and 3 of 2000. (See Verification Report for Ningbo Nanlian Frozen Foods Co., Pub. R. Doc. 188 (Mar. 13, 2000) ("NNL Verification Report").) Present at NNL's verification were Mr. Lin Zhongnan, the

---

[5]     These meetings dealt with allegations that other PRC crawfish tail meat exporters, with names similar to that of HFTC5, were unlawfully taking advantage of HFTC5's antidumping duty margin. See Huaiyin Foreign Trade Corp. (30) v. United States Dep't of Commerce, 26 CIT __, Slip Op. 02-42 (Apr. 30, 2002).

Chairman and General Manager of NNL, Mr. Edward Lee, the full owner of Hontex and co-owner of NNL, and Mr. Wei, who was identified as a consultant to NNL. (See id. at 13.) In addition to providing general information about the formation and business of NNL, Mr. Wei was also questioned about his relationships with NNL, HFTC5, and HFTC5's customers.

Commerce then published the results of its investigation. See Final Results, 65 Fed. Reg. 20,948. Commerce stated that because there was evidence that the Companies were "affiliated" and that their operations "intertwined" NNL did "not merit a separate rate" from HFTC5, and so was assigned HFTC5's antidumping duty margin of 201.63 percent. Id. at 20,949 & n.1 (adopting reasoning set forth in Issues and Decision Memo for the Admin. Rev. of the Antidumping Duty Order on Freshwater Crawfish Tail Meat from the PRC—March 26, 1997 through August 31, 1998, Pub. R. Doc. 214 (Apr. 7, 2000) ("Decision Memo")).

Hontex then brought this action arguing: (1) NNL's due process rights had been violated by prejudgment in the administrative process; (2) Commerce's "collapsing" of NNL and HFTC5 and assigning them a single antidumping duty margin was not supported by substantial evidence or otherwise in accordance with law; and (3) Commerce's calculation for the factor of production "crawfish scrap" was not supported by substantial evidence or otherwise in accordance with law. Hontex then moved for discovery, which motion was denied by the court.[6]

---

[6] Citing Ammex, Inc. v. United States, 23 CIT 549, 556, 62 F. Supp. 2d 1148, 1156 (1999), the court denied Hontex's motion stating that it was based on "speculation and conjecture." See Hontex Enter., Inc. v. United States, Court No. 00-00223, Mem. Op. & Order (Apr. 16, 2001) ("Hontex Order").

**DISCUSSION**

I.     **Due Process**

A.     **Standard for Prejudgment**

Hontex first argues that "[i]n this Administrative Review, the Department's actions denied [NNL] of [its] Constitutional right to due process" (Pl.'s Mem. at 2) because subsequent to the publication of the Preliminary Results Commerce "became convinced that Ningbo Nanlian and HFTC (5) were lying to it about their relationship, that they were in fact affiliated with each other, and that they needed to be punished. . . . [E]very action thereafter was taken to create a record that would only support the Department's position." (Pl.'s Mem. at 8.)

When determining whether prejudgment exists, the court examines whether there is evidence that the administrative decision maker was unable to proceed fairly. NEC Corp. v. United States, 151 F.3d 1361, 1373 (Fed. Cir. 1998) ("NEC IV"); NEC Corp. v. United States Dep't Commerce, 21 CIT 198, 203, 958 F. Supp. 624, 629 (1997) ("NEC II") ("The actionable claim is an advance commitment about the outcome of a dumping investigation . . . ."); see also Withrow v. Larkin, 421 U.S. 35, 46–54 (1975) (overturning injunction where board's combination of investigative and adjudicative functions were not a violation of due process, and process itself did not contain unacceptable risk of bias); United States v. Morgan, 313 U.S. 409, 420–21 (1941) (declining to overturn decision where bias was alleged prior to proceeding but administrator had only set out general views on subject matter); Cinderella Career & Finishing Schs., Inc. v. FTC, 425 F.2d 583, 591 (D.C. Cir. 1970) (citing Gilligan, Will & Co. v. SEC, 267 F.2d 461, 469 (2d Cir. 1959)) ("The test for disqualification has been succinctly stated as being

whether 'a disinterested observer may conclude that [the agency] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'" (bracketing in original)); Texaco, Inc. v. FTC, 336 F.2d 754, 760 (D.C. Cir. 1964) (citing Gilligan, 267 F.2d at 468–69) (disqualifying administrator where "a disinterested reader of [one of his speeches] could hardly fail to conclude that he had in some measure decided in advance that [a party] had violated the Act.").

While this court need not decide "whether the obligation imposed on the Government to deal honestly and fairly with those who come before it arises from the existence of the law itself and the implicit assumptions about how Congress intends Government decision makers to conduct themselves," or from the due process clause of the Constitution, "[t]here can be no doubt that arbitrary administration of the law is subject to judicial intervention; it is enough here to conclude that [a party] is due a fair and honest process . . . ." NEC IV, 151 F.3d at 1371 (citing Parsons v. United States, 670 F.2d 164, 166 (Ct. Cl. 1982); Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).

Thus, whatever the source, NNL was entitled to an "impartial decision maker," including one who had not prejudged the proceedings. In order to sustain a claim of prejudgment, however, Hontex must establish that the decision maker is "not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n, 426 U.S. 482, 493 (1976) (quoting Morgan, 313 U.S. at 421); NEC IV, 151 F.3d at 1373 (quoting Hortonville, 426 U.S. at 493). The Court of Appeals for the Federal

Circuit has stated that "[t]his standard is met when the challenger demonstrates, for example, that the decision maker's mind is 'irrevocably closed' on a disputed issue." NEC IV, 151 F.3d at 1373 (citing FTC v. Cement Inst., 333 U.S. 683, 701 (1948)). The court found this standard to be appropriate for two reasons. First, those charged with administering the antidumping statute "'are assumed to be men of conscious and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'" Withrow, 421 U.S. at 55 (quoting Morgan, 313 U.S. at 421); NEC IV, 151 F.3d at 1373 (quoting Withrow, 421 U.S. at 55); see NEC II, 21 CIT at 202, 958 F. Supp. at 629 (quoting Cement Inst., 333 U.S. at 701) ("To prevail on a prejudgment claim a plaintiff must overcome the presumption of honesty and integrity in the administrative [decision maker] . . . ."). Second, "the administrative process must have the flexibility necessary to accomplish its mission." NEC IV, 151 F.3d at 1373. Because the court should not "risk upsetting [the antidumping statute] that Congress developed in exercising its broad power over foreign commerce," id. at 1374, it should be "reluctant to circumvent the normal administrative procedure absent a showing that the decision maker's mind is 'irrevocably closed.'" Id. at 1373. It must be kept in mind, however, that in an antidumping investigation the "statute contemplates that a [decision maker] will make up its mind over the course of the administrative process, starting from a viewpoint at the initiation of the investigation, e.g.—'there may be dumping,' and leading to a conclusion upon issuance of the final determination, e.g.—'there is dumping,' or 'there is no dumping.'" NEC II, 21 CIT at 202–03, 958 F. Supp. at 629.

In the context of an antidumping duty investigation the administrative decision maker

responsible for the final outcome of the investigation is the Assistant Secretary for Import Administration. See 19 C.F.R. § 351.102(b) (2000) ("The Secretary has delegated to the Assistant Secretary for Import Administration the authority to make determinations under title VII of the Act and this Part."); NEC Corp. v. United States Dep't Commerce, 21 CIT 933, 948, 978 F. Supp. 314, 329 (1997) ("NEC III") (citing NEC II, 21 CIT at 209–10, 958 F. Supp. at 635–36) ("[T]he independently formed opinions of Import Administration staff are not relevant to the prejudgment cause of action recognized here. Import Administration staff must communicate their recommendations to their superiors as part of their official duties; these recommendations are not final . . . and cannot lead to a showing that the mind of the Assistant Secretary for Import Administration, the [decision maker] in antidumping investigations, is closed."). Thus, in order to succeed in its prejudgment claim, Hontex must show that the administrator with ultimate responsibility for making a determination at the close of the investigation, and not those persons responsible for interim determinations or recommendations, prejudged either the relevant facts or law. It is important to note, however, that even if Hontex has not made out a case of prejudgment, the court must ensure that the Companies were subject to an administrative process that was fundamentally fair. See NEC IV, 151 F.3d at 1371 (stating a party "is due a fair and honest process . . . ."); id. at 1373. As a result, the court has examined Hontex's arguments with respect to prejudgment to determine whether they present questions of fairness and honesty.

B. **Evidence of Prejudgment**

Hontex argues that "a fair reading of the record illustrates that the Department prejudged [NNL] in this case." (Pl.'s Mem. at 11.) In support of this argument Hontex alleges the record shows that Commerce: (1) prematurely determined that NNL and HFTC5 were affiliated; (2) relied on undocumented ex parte information in its investigation; (3) did not properly conduct verification of the Companies' submitted information; and (4) created a biased verification report. While Hontex concedes that the bar for proving a claim of prejudgment is a high one, and that in isolation none of these claims would survive a claim of prejudgment, "[t]aken as a whole, it is clear in this case that the Department willfully abandoned its usual neutral role in antidumping matters. Instead of gathering facts that would be analyzed to reach a conclusion, the Department . . . appears to have irrevocably made the decision that Ningbo Nanlian and HFTC (5) were affiliated."[7] (Pl.'s Mem. at 16.)

The Government contends that Hontex has not met the standard for prejudgment articulated by the Court of Appeals for the Federal Circuit in NEC IV in that Hontex "has failed to demonstrate that the decision maker, here, Joseph A. Spetrini, Acting Assistant Secretary for Import Administration, or any other Commerce official was not capable of judging the relationship between [NNL] and HFTC(5) fairly on the basis of the circumstances." (Def.'s

---

[7]     Hontex nowhere argues or presents evidence that any Commerce official decided the issues of affiliation or collapsing prior to commencement of the antidumping investigation. Rather, Hontex's claim is based on prejudgment allegedly arising sometime after publication of the Preliminary Results and continuing throughout the period during which a "[decision maker] will make up its mind" as to the outcome of the investigation. See NEC II, 21 CIT at 202, 958 F. Supp. at 629.

Resp. at 10.)

### 1.       Premature Conclusion of Collapsing

Hontex first argues that Commerce "prematurely" concluded that NNL and HFTC5 should be collapsed into a single entity.  In other words, Hontex is alleging that after publication of the <u>Preliminary Results</u>, but prior to publication of the <u>Final Results</u>, Commerce came to the irreversible conclusion that the Companies should be collapsed, and that certain actions on Commerce's part are proof it "had an irrevocably closed mind with respect to the issue of whether Ningbo Nanlian and HFTC (5) should be treated as one company."  (Pl.'s Mem. at 11.)  In support of its position, Hontex points to two pieces of evidence: (1) a letter from Customs to NNL (<u>see</u> letter from Arent Fox to Commerce of 3/15/00, Conf. R. Doc. 31 Ex. 1 (the "Customs Letter")); and (2) a letter from Commerce to NNL (<u>see</u> letter from Commerce to Arent Fox of 1/12/00, Pub. R. Doc. 141 (the "Commerce Letter")).

### a.       The Customs Letter

Hontex argues that the language of the Customs Letter, in which NNL was informed that the amount of its continuous bond was being raised, is "strong evidence that NNL had been prejudged.  The only way for U.S. Customs to make the statement that there was a 'strong possibility' that [NNL] would be given a 201.63% deposit rate, would be if [it] had been so informed by the Department."  (Pl.'s Mem. at 13.)  The Government contends that "[g]iven that the review was not yet completed, in order to protect revenue, the Customs Service could well have decided to estimate the potential margin to be [the PRC-wide rate] because that was the

margin that had been preliminarily determined for companies that did not establish entitlement to a separate rate." (Def.'s Resp. at 11–12 (footnote omitted).) In addition, the Government argues that "whatever the reasons of the Customs Service for increasing the amount of the bond, the action of the Customs Service does not evidence any prejudgment on the part of Commerce." (Id. at 12.)

While the Customs Letter does contain the "strong possibility" language cited by Hontex, it nowhere suggests the kind of "closed mind" on the part of the Assistant Secretary for Import Administration necessary to sustain a claim of prejudgment. Indeed, the Customs Letter first states that "no final determination" has been made in the matter and that, based on Customs's "risk assessment" analysis, Hontex's imports "may" be subject to the PRC-wide antidumping duty rate. (Customs Letter, Conf. R. Doc. 31, Ex. 2 at 2.) The Customs Letter also states that those responsible for making the risk assessment determination were Customs officials, and not those persons performing the antidumping investigation. (Id.) That Customs could independently conclude that entries of the subject merchandise warranted a higher continuous bond is reasonable given that the record shows that Mr. Wei, on behalf of HFTC5, had repeatedly alerted Customs that other crawfish tail meat exporters were using HFTC5's antidumping rate. (See Customs Report, Pub. R. Doc. 191 Attachs.) In any event, this communication from Customs, an agency separate from Commerce, cannot be evidence of an "irrevocably closed" mind or unfair behavior on the part of any Commerce official. NEC IV, 151 F.3d at 1373.

### b. The Commerce Letter

Hontex next cites, as evidence of prejudgment, the Commerce Letter. This letter asked NNL to provide additional information to "explain the contradiction between Ningbo Nanlian's claim [in its original questionnaire response] not to share managers with other Chinese crawfish exporters and the evidence on the record of this review that shows Mr. Wei Wei was a manager at both Ningbo Nanlian and HFTC[5] in 1998." (Commerce Letter, Pub. R. Doc. 141 at 1.)

Hontex argues that "the only piece of information that was on the record with respect to Philip Wei's dual role at the time of the Department's letter . . . was Philip Wei's signature on a single HFTC 5 sales confirmation." (Pl.'s Mem. at 14 (emphasis in original).) Hontex contends that the tenor of this letter's language is proof of Commerce's prejudgment of the issue of affiliation because "[h]ad NNL not already been prejudged, then the Department would have asked a neutral, fact-finding question . . . ." (Pl.'s Mem. at 15.) In response the Government contends "[t]hat Commerce's inquiry was warranted is demonstrated by Ningbo's [supplemental questionnaire] response, conceding that '[r]espondents recognize that Mr. Wei's signature on the April 16, 1998, sales confirmation for HFTC(5), does raise a question as to Mr. Wei's role with regard to HFTC(5).'" (Def.'s Resp. at 12 (emphasis in original) (citing letter from Arent Fox to Commerce of 1/31/00, Pub. R. Doc. 146 at 3).) The Government further argues: (1) "the question as phrased by Commerce demonstrated the reason why the uncovered evidence was relevant to the issue"; (2) "[a]s an investigatory tool, Commerce must be permitted to phrase questions which may suggest an answer as a method to obtain information"; and (3) "even if Commerce had 'concluded' that Mr. Wei was a manager of both entities at the time Commerce

issued the supplemental questionnaire, no prejudgment claim would lie," because "'it is not enough for plaintiff[] to show that Commerce officials had formed opinions.' The statute 'contemplates that a decisionmaker will make up its mind over the course of an administrative process . . . .'" (Def.'s Resp. at 13–14 (citing NEC II, 21 CIT at 202, 958 F. Supp. at 629).)

Commerce is entitled to request additional information to clarify questionnaire responses, and asking this type of question was perfectly in order considering that Mr. Wei's name appears both on an HFCT5 sales confirmation dated during NNL's POR and on NNL's original business license. While the language quoted by Hontex can be interpreted as demonstrating a suspicion of affiliation, it in no way evidences an "irrevocably closed" mind on behalf of the decision maker or, for that matter, on behalf of those conducting the investigation.

### 2.     Ex Parte Communications

Hontex next argues that

> [c]ontrary to . . . laws, regulations, and policy, in the present case, [Hontex] believes that the Department received ex parte communications, that the information was considered by the Department for purposes of its final determination, and that the Department did not allow [NNL] a meaningful opportunity to comment on that information; this impacted [NNL's] right to defend itself or to substantively respond to that information.

(Pl.'s Mem. at 20.) As evidence in support of its argument Hontex references a telephone conversation between its counsel and the Director of Office VIII, AD/CVD Enforcement on January 17, 2000, during which Hontex claims it "was informed that the Department had information for which it was 'attempting to obtain clearance' [from Customs] to place on the

Administrative Record." (Id. at 21.) Hontex states that to its knowledge "that ex parte information was never placed on the Administrative Record."[8] (Id.) In light of this alleged evidence Hontex urges the court to be "skeptical" that the record is complete. (Id. at 22.) Hontex then speculates that since Customs raised the amount of the bond to the PRC-wide rate of 201.63 percent "sometime prior to December 9, 1999, the Department must have communicated to Customs that it believed that Ningbo Nanlian would ultimately receive a rate of 201.63% antidumping rate." (Id. at 21.)

The Government argues that Hontex has failed "to demonstrate that it was prejudiced because documents were not timely added to the administrative record and it was, thus, deprived of an opportunity to comment" on any such documents. (Def.'s Resp. at 16.) The Government concedes that "documents have been added to the administrative record since the commencement of this case" but argues "Hontex has not identified a single one of the documents as one upon which it would have liked to comment but was unable to comment and has not shown that its alleged inability to comment has in any way prejudiced it." (Id. at 17.)

---

[8]   Hontex broadly claims that Commerce violated the relevant statutes, regulations and case law pertinent to placing ex parte information on the record. (See Pl.'s Mem. at 17–20 (citing 19 U.S.C. §§ 1677m(g), 1677f(a)(3), 1516a(b)(2)(A); 19 C.F.R. §§ 351.104(a)(1), .301(c)(1); Kao Hsing Chang Iron & Steel Corp. v. United States, 25 CIT __, 140 F. Supp. 2d 1379 (2001); Nippon Steel Corp. v. United States, 24 CIT __, 118 F. Supp. 2d 1366 (2000)).) Hontex, however, has not presented the court with actual evidence of ex parte communications taking place wherein Commerce allegedly prejudged the Companies. In addition, Hontex makes no claim that any ex parte conversations between its counsel and a Commerce official should be included on the record. Rather, it seeks to have other alleged ex parte contacts placed thereon. The court has previously considered these claims and found them lacking. See Hontex Order.

The court does not agree that Hontex has presented evidence of an "irrevocably closed"
mind on the part of Commerce. As noted above, that Customs concluded that NNL should have
its continuous bond raised to the PRC-wide rate was in all likelihood based on its own acquired
knowledge and is not evidence of prejudgment on the part of Commerce. Second, Hontex's
belief that ex parte communications were not placed on the record was found by this court to be
based upon speculation and conjecture when it denied Hontex's motion for discovery. See
Hontex Order. Here, Hontex has offered nothing further to convince the court that any
undocumented ex parte communications took place or, more importantly, convincingly
demonstrated how it was treated unfairly, or how any such ex parte communications would be
evidence of an "irrevocably closed" mind on the part of Commerce.

### 3. Verification

Next, Hontex argues it "believes that the Department's actions at the verification . . .
serve to highlight how the Department violated [NNL's] due process right in the review." (Pl.'s
Mem. at 25.) Specifically, Hontex argues that the lead verifier, allegedly a person who had not
previously worked on the investigation, was sent "as a way to complete the Administrative
Record in such a manner as to support the Department's already foregone conclusions." (Id. at
25.) The Government argues that Commerce "has discretion to select a particular verification
methodology." (Def.'s Resp. at 15 (citing Micron Tech., Inc. v. United States, 117 F.3d 1386,
1396 (Fed. Cir. 1997)).) Furthermore, "[i]n selecting the individuals who would conduct the
verification of Ningbo as well as the individuals who would be questioned, the questions to be
raised, and the documents to be examined, Commerce simply exercised its discretion in

conducting a verification." (Def.'s Resp. at 15.)[9]

### a. Lead Verifier

Hontex asserts that "sending . . . an individual who had absolutely no knowledge of the case, and who had not even bothered to review the basic facts behind the case, is inexcusable." (Pl.'s Mem. at 25.) Hontex does not, however, dispute the lead verifier's competence to conduct verification, and points to no specific conduct by that person that would lead the court to adopt Hontex's conclusion. In addition, no argument is made regarding the skill or level of care

---

[9] Generally, when requested by an interested party Commerce "shall," to the extent practicable, verify information presented to it during an antidumping review. See 19 U.S.C. § 1677m(i)(3); 19 C.F.R. § 351.307(a). As noted by the Government, Commerce enjoys wide discretion in selecting its verification methodology. See Micron, 117 F.3d at 1396. As summarized by the Court of Appeals for the Federal Circuit:

> By requiring that Commerce report, on a case-by-case basis, the methods and procedures used to verify submitted information, Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc. Since "the action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because [we] might have made a different determination were [we] empowered to do so." Therefore, we review verification procedures employed by Commerce in an investigation for abuse of discretion rather than against previously-set standards.

Micron, 117 F.3d at 1396 (citations and footnotes omitted; bracketing in original). While Commerce is charged with verification, the procedure employed need not delve into every factual detail. See id. (citing Monsanto Co. v. United States, 12 CIT 937, 944, 698 F. Supp. 275, 281 (1988); Bomont Indus. v. United States, 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990)). Indeed, Commerce need only verify information in an administrative review where an interested party requests verification and Commerce has not conducted verification during "either of the two immediately preceding administrative reviews." See 19 U.S.C. § 1677m(i)(3); 19 C.F.R. § 351.307(b)(v).

exhibited by the lead verifier. Because verification can be likened to an "audit" of submitted information, see Bomont, 14 CIT at 209, 733 F. Supp. at 1508 ("[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."), mere lack of detailed knowledge by an investigator of a case prior to verification is not evidence of an "irrevocably closed" mind on the part of the verifying team or the administrative decision maker.

### b. "Confronting" Mr. Wei

Hontex argues that Mr. Wei should have been "confronted" with the evidence provided by Customs that he represented himself as "Vice General Manager" of HFTC5's crawfish export business. Hontex contends "[d]ue process mandates that Philip Wei (and [NNL]) be confronted with the 'evidence' which was to be used against him and [NNL]." (Pl.'s Mem. at 25.) The Government argues that the "constitutional right of confrontation applies only '[i]n all criminal proceedings'" and not civil proceedings (Def.'s Resp. at 14 (citing U.S. Const. amend. VI; Hannah v. Larche, 363 U.S. 420, 440 n.16 (1960))) and that "Hontex had ample opportunity to comment on the verification report as demonstrated by [its] submission of March 20, 2000 . . . ." (Id. at 14–15.)

While it may have been a better investigative technique to provide Mr. Wei with the opportunity to explain the meaning of these documents at the time of verification, Hontex was provided the opportunity to comment on them once they were placed on administrative record and, in fact, did so comment. (See Case Brief on Issues Related To The Verification Report And

Affiliations, Conf. R. Doc. 34 Attach. at 3–4.) Indeed, Commerce specifically addressed this concern in the Decision Memo, stated that it had "afforded all interested parties an opportunity to submit comments on these documents" (Decision Memo, Pub. R. Doc. 214 at 42), and Hontex does not dispute this statement. This being the case, Commerce's behavior was not unfair and its adoption of a methodology which did not provide Mr. Wei an immediate opportunity to comment on the documents is not evidence of unfairness on the part of the verifiers or of an "irrevocably closed" mind on the part of the administrative decision maker.

### c. Knowledge of Mr. Wei's Activities

Hontex states that "not once did the verification team ask the owners of Ningbo Nanlian . . . whether they were aware of the activities of Philip Wei vis-á-vis HFTC (5)." (Pl.'s Mem. at 26.) Again, Hontex was given an adequate opportunity to provide additional information as to whether NNL's owners were aware of Mr. Wei's activities on behalf of HFTC5 and did, in fact, raise this issue and endeavor to explain its significance at the administrative level. (See Case Brief on Issues Related to the Verification Report and Affiliations, Conf. R. Doc. 34 Attach. at 4.) Indeed, Commerce specifically addressed this concern in the Decision Memo. (See Decision Memo, Pub. R. Doc. 214 at 37–38.) Thus, this is neither evidence of unfair behavior by Commerce staff nor of an "irrevocably closed" mind on the part of the administrative decision maker.

### 4.    Verification Report

Hontex contends that "[t]he Department's Verification Report of Ningbo Nanlian dated March 13, 2000 is a document that appears to have been drafted with only one goal in mind: support the Department's position that Ningbo Nanlian and HFTC (5) are affiliated." (Pl.'s Mem. at 26–27.) In support of this argument Hontex contends that Commerce wrote the verification report: (1) using "words with a negative connotation . . . instead of neutral language"; (2) "made 'findings' that were simply not true"; and (3) omitted "key exculpatory information." (Id. at 27–28.) The Government argues that the "verification report . . . reflects the observations of the verifiers. The fact that [the observations] may vary from those of Hontex or its counsel does not mean that [the observations] are the result of any prejudgment." (Def.'s Resp. at 16.)

As to "words with a negative connotation" Hontex points to only one example, the use of the word "revealed" in the verification report. (See NNL Verification Report, Pub. R. Doc. 188 at 7 ("Mr. Wei initially stated that he did not have a relationship with Ningbo. However, Mr. Wei later revealed that Mr. Lee asked him to help set up Ningbo in 1998.").) Hontex argues it "do[es] not understand the Department's use of such language in a verification report which is supposed to be a straight-forward, factual document." (Pl.'s Mem. at 27.) There is nothing unfair about Commerce officials employing language that best conveys their findings, and the use of such language in a report generated by administrative staff, as distinct from the Decision Memo signed by the administrative decision maker, is simply not evidence of an "irrevocably closed" mind on the part of the administrative decision maker. See NEC III, 21 CIT at 948, 978 F. Supp. at 329.

Finally, the Government contends, and Hontex does not dispute, that Hontex's concerns as to the verification report containing improper findings and missing exculpatory information were raised at the administrative level, thus providing an opportunity for "untrue" material to be corrected and "key exculpatory information" to be highlighted. (See Def.'s Resp. at 16; Pl.'s Mem. at 27; Case Brief on Issues Related to the Verification Report and Affiliations, Conf. R. Doc. 34 at 3 (missing "exculpatory" information); Case Brief on Issues Related to the Verification Report and Affiliations, Conf. R. Doc. 35 at 7 (suspect "findings").) Hontex, however, neither argues that its concerns were not taken into account by the administrative decision maker nor points to specific evidence in the Decision Memo of Commerce relying on the factors found troubling by Hontex. In any event, as is the case with the verification report's use of allegedly biased language, the findings and conclusions of the administrative staff, as opposed to the conclusions reached by the administrative decision maker, are not evidence of an "irrevocably closed" mind on the part of the decision maker. See NEC III, 21 CIT at 948, 978 F. Supp. at 329.

### C. Conclusion

Hontex presents no evidence that either the administrative official responsible for the ultimate decision, the Acting Assistant Secretary for Import Administration, had an "irrevocably closed" mind or prejudged the issue of affiliation, or that those advising him conducted the investigation in an unfair or dishonest manner. The record shows that Commerce, based on information provided by the Companies in their questionnaire responses, preliminarily determined that NNL and HFTC5 were eligible for a separate company-specific antidumping

duty margins. During Commerce's investigation questions arose as to the relationship between the Companies. Such evidence included Mr. Wei's name appearing on NNL's original business license, which was included in NNL's original questionnaire response, and Mr. Wei's signature appearing on an HFTC5 sales invoice dated during NNL's POR, which was submitted with HFTC5's original questionnaire response. Commerce then attempted to verify the accuracy of HFTC5's and NNL's submitted responses. As part of this process, Mr. Wei was questioned as to his relationship with HFTC5 and NNL. Thereafter, Hontex was given an opportunity to examine the evidence and comment on it. Finally, after analysis of the information collected during the investigation, Commerce concluded NNL and HFTC5 were affiliated and should be collapsed, and determined that both companies should receive a single rate—a rate based on HFTC5's refusal to submit to verification. Although Hontex may have produced some evidence calling into question Commerce's ultimate conclusions, absent particularized evidence of an "irrevocably closed" mind on the part of the administrative decision maker, Hontex's claim of prejudgment fails. NEC IV, 151 F.3d at 1373. In addition, the evidence highlighted by Hontex fails to demonstrate that Commerce's investigation was not fundamentally fair. Id. Thus, Hontex has not overcome the presumption of honesty and integrity of the administrative decision maker or other Commerce officials, and the court concludes that NNL was neither deprived of due process by prejudgment, nor of its right to a fundamentally fair administrative process.

## II.     Collapsing

After reviewing the Companies' submissions and the information acquired during verification, Commerce determined that the Companies were a single entity and so should

receive a single antidumping duty margin.  The duty margin assigned to the "collapsed" entity

was based on HFTC5's rate, which was determined to be the NME-wide rate as HFTC5 refused

verification of its questionnaire responses.  Commerce took this action despite concluding that, in

an NME context, "[n]either the statute nor the regulations contain guidelines for issuing separate

rates or determining when two or more exporters should receive the same rate . . . ."

(Relationship of Ningbo Nanlian Frozen Foods Co., Ltd. and Huaiyin Foreign Trade Corp. (5),

Conf. R. Doc. 39 at 3 ("Relationship Memo")); see Yancheng Baolong Biochem. Prods. Co. v.

United States, 26 CIT __, __, 219 F. Supp. 2d 1317, 1320–21 (2002) (reviewing, without

comment, Commerce's decision not to collapse NME exporters with reference to 19 U.S.C. §

1677(33)(F) and 19 C.F.R. § 351.401(f)).  Commerce continued by stating:

> In NME cases, we are generally concerned with central
> government control and only grant separate rates where an
> exporter's export activities are shown to be independent of such
> government control.  We also recognize, however, that the export
> activities of two or more NME exporters, even though independent
> of central government control, may be intertwined by other means
> such that, as in market economy cases, it is appropriate to treat
> such exporters as a single entity and to determine a single
> weighted-average margin for that entity.  Accordingly, it is
> appropriate to consider evidence that the export activities of two or
> more NME exporters are not independent but in fact may be under
> common control.

(Relationship Memo at 3.)


Hontex argues that Commerce's decision to collapse the Companies into a single entity is

not supported in law or fact.  Specifically, Hontex contends that Commerce's determination was

not in accordance with law because "[t]here is absolutely no support given . . . that

the . . . statutes and regulations do not apply to NME cases . . . ." (Pl.'s Mem. at 33.) Hontex

further argues that, pursuant to 19 C.F.R. § 351.401(f), Commerce

> should have first determined that the two Companies were
> affiliated. Then it should have used the traditional three-prong test
> for determining whether parties deemed affiliated should be
> collapsed and treated as a single entity for purposes of calculating
> antidumping duty margins. . . . [T]he Department may 'collapse'
> entities where the following criteria are met:
>
> 1.      The entities are affiliated;
>
> 2[.]    The entities have production facilities for producing similar
>         or identical products that are sufficiently similar so that a
>         shift in production would not require substantial retooling;
>         and
>
> 3.      There is significant potential for the manipulation of price
>         or production.

(Pl.'s Mem. at 33–34 (citing <u>Cut-to-Length Carbon-Quality Steel Plate Prods. From Indon.</u>, 64

Fed. Reg. 41,206, 41,209 (July 29, 1999) (prelim. determination) ("<u>Steel Plate</u>"); 19 C.F.R. §

351.401(f)).) Hontex also argues that Commerce's determination is not supported by substantial

evidence because the finding that a "web of control relationships" existed between the

Companies is not supported by the record. (<u>Id.</u> at 35.) In opposition the Government contends

that Commerce's determination is in accordance with law because Commerce was not bound to

follow the relevant market economy regulation as "the regulation addresses the situation in which

Commerce is generally required to treat two producing entities as a single company. It does not

address Commerce's authority regarding two trading companies in an NME context." (Def.'s

Resp. at 19.) Furthermore, the Government asserts that Commerce's determination that the

Companies were a single entity is supported by substantial evidence on the record. (<u>See id.</u> at

21.)

### A.      Market Economy Companies

Commerce's practice of assigning entities a single antidumping duty margin—i.e., "collapsing" them into a single entity—has been reviewed by this court in the context of market economy producers.  Although the antidumping statute does not expressly address the issue of collapsing, this court has found Commerce's collapsing practice, now found in its regulations, to be a reasonable interpretation of the statute.  See 19 C.F.R. § 351.401(f)[10]; Koenig & Bauer-

---

[10]      This regulation provides:

> Treatment of affiliated producers in antidumping proceedings—(1)
> In general.  In an antidumping proceeding under this part, the
> Secretary will treat two or more affiliated producers as a single
> entity where those producers have production facilities for similar
> or identical products that would not require substantial retooling of
> either facility in order to restructure manufacturing priorities and
> the Secretary concludes that there is a significant potential for the
> manipulation of price or production.
>
> (2) Significant potential for manipulation.  In identifying a
> significant potential for the manipulation of price or production,
> the factors the Secretary may consider include:
>
>> (i) The level of common ownership;
>>
>> (ii) The extent to which managerial employees or
>> board members of one firm sit on the board of
>> directors of an affiliated firm; and
>>
>> (iii) Whether operations are intertwined, such as
>> through the sharing of sales information,
>> involvement in production and pricing decisions,
>> the sharing of facilities or employees, or significant
>> transactions between the affiliated producers.

(continued...)

Albert AG v. United States, 24 CIT __, __, 90 F. Supp. 2d 1284, 1287 (2000) (citing Asociacion

de Colombiana de Exportadores de Flores v. United States, 22 CIT 173, 201, 6 F. Supp. 2d 865,

893 (1998); Queen's Flowers de Colom. v. United States, 21 CIT 968, 971–72, 981 F. Supp. 617,

622–23 (1997)) ("Commerce's collapsing practice has been approved by the court as a

reasonable interpretation of the antidumping statute.").[11]  Pursuant to regulation, Commerce

follows several steps when determining whether market economy producers should be collapsed.

See 19 C.F.R. § 351.401(f); Steel Plate, 64 Fed. Reg. at 41,209.  First, Commerce must

determine whether two or more market economy producers are "affiliated."  19 C.F.R. §

351.401(f)(1); see Steel Plate, 64 Fed. Reg. at 41,209; 19 C.F.R. § 351.102(b) ("'Affiliated

persons' and 'affiliated parties' have the same meaning as in [19 U.S.C. § 1677(33)].");  Ta Chen

----

[10](...continued)
19 C.F.R. § 351.401(f).

[11]     Commerce's market economy collapsing methodology was developed over time and reduced to regulations to bring it into conformance with the Uruguay Round Agreements Act.  See Koenig, 24 CIT at __, 90 F. Supp. 2d. at 1287; Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,296, 27,296 (ITA May 19, 1997) (final rule) ("Final Rule").  As part of this process, regulations underwent an extensive notice and comment process.  See: (1) Antidumping Duties; Countervailing Duties, 60 Fed. Reg. 80 (ITA Jan. 3, 1995) (notice of proposed rulemaking, request for comments); (2) Antidumping Duties; Countervailing Duties, 60 Fed. Reg. 9802 (ITA Feb. 22, 1995) (advance notice of proposed rulemaking, extension of comment period); (3) Antidumping and Countervailing Duties, 60 Fed. Reg. 25,130 (ITA May 11, 1995) (interim regulations, request for comments); (4) Antidumping and Countervailing Duty Proceedings, 61 Fed. Reg. 4826 (ITA Feb. 8, 1996) (proposed rule, request for comments); (5) Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7308 (ITA Feb. 27, 1996) (proposed rulemaking, request for comments); (6) Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 18,122 (ITA Apr. 24, 1996) (extension of deadline to file comments, announcement of hearing); (7) Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 28,821 (ITA June 6, 1996) (opportunity to file comments on hearing); (8) Countervailing Duties, 62 Fed. Reg. 8818 (ITA Feb. 26, 1997) (notice of proposed rulemaking, request for comments); and (9) Countervailing Duties, 62 Fed. Reg. 19,719 (ITA Apr. 23, 1997) (extension of deadline to file comments).

Stainless Steel Pipe, Ltd. v. United States, 23 CIT 804, 808 (1999) ("Ta Chen I"), aff'd, Ta Chen

Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330 (Fed. Cir. 2002) ("Ta Chen II")

("Commerce's regulations adopted the statutory definition of 'affiliated persons.'").[12] Two

entities are "affiliated"[13] where they share either certain relationships, such as by family, shared

company officers, directors, partners, employer/employee status, or cross-ownership of voting

stock, see 19 U.S.C. § 1677(33)(A)–(E), or share any other relationship by which one entity is

"legally or operationally in a position to exercise restraint or direction over the other . . . ." See,

e.g., 19 U.S.C. § 1677(33)(F), (G); Ta Chen I, 23 CIT at 808 (citing 19 U.S.C. § 1677(33)(G));

Ta Chen II, 298 F.3d at 1333 (stating under the latter part of this formulation "if an exporter has

operational control over its U.S. customer, the exporter is affiliated regardless of ownership.");

19 C.F.R. § 351.102(b) ("The Secretary will not find that control exists on the basis of these

factors unless the relationship has the potential to impact decisions concerning the production,

pricing, or cost of the subject merchandise . . . ."). The next step in Commerce's market

economy collapsing methodology is to determine whether producers share "production facilities

for similar or identical products . . . ." 19 C.F.R. 351.401(f)(1); Marine Harvest (Chile) S.A. v.

---

[12]        With respect to the codification of this term "[t]he question of affiliation is relevant to a number of price and cost issues in an antidumping investigation or review.  One example is the special rule for major inputs in existing section 773(e)(3), a provision added to the law in 1988 to address diversionary input dumping . . . ."  Statement of Administrative Action to accompany H.R. Doc. 103-316, at 838 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4175.

[13]        The threshold for determining whether parties are "affiliated" is different from the threshold for determining whether they should be "collapsed."  Compare 19 C.F.R. § 351.102(b) (stating Commerce will not find parties affiliated "unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise." (emphasis added)), with 19 C.F.R. § 351.401(f) (stating Commerce may collapse parties where "there is a significant potential for the manipulation of price or production." (emphasis added)).

United States, 26 CIT __, __ n.9, Slip Op. 02-134 at 6 n.9 (Oct. 31, 2002); see Steel Plate, 64 Fed. Reg. at 41,209; see also Yancheng, 26 CIT at __, 219 F. Supp. 2d at 1320. Finally, Commerce must determine whether there is evidence that one affiliated producer has the "significant potential for the manipulation of price or production" of the other. 19 C.F.R. § 351.401(f)(1); Marine Harvest, 26 CIT at __, n.9, Slip Op. 02-134 at 6 n.9; see Steel Plate, 64 Fed. Reg. at 41,209. To determine whether the "significant potential for manipulation" exists, Commerce considers a non-exhaustive list of factors to determine whether there is more than "mere affiliation" between two market economy producers. See 19 C.F.R. § 351.401(f)(2); AK Steel Corp. v. United States, 22 CIT 1070, 1080 n.22, 34 F. Supp. 2d 756, 764 n.22 (1998), aff'd in part, rev'd on other grounds, AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000) (citing Final Rule and stating "the 'significant potential for price manipulation' language entails that 'collapsing requires a finding of more than mere affiliation,' but is not such a high standard that Commerce will only collapse in '"extraordinary" circumstances.'").

### B. NME Exporters

In the instant investigation, Commerce determined that portions of the collapsing regulations were inapplicable to the extent that they addressed only market economy entities and not "NME exporters" and their "export decisions." (Relationship Memo, Pub. R. Doc. 181 at 3); see 19 C.F.R. § 351.401(f)(1). As such, Commerce altered the collapsing methodology to take into account its pre-existing method of assigning antidumping duty margins to NME exporters. Just as the antidumping statute does not specifically address collapsing producers in the market economy context, however, the statute does not address collapsing NME exporters. Thus,

Commerce sought to develop a collapsing methodology not specifically authorized by statute.

When confronted with statutory silence or ambiguity, Commerce may resolve such silence or

ambiguity by articulating a permissible interpretation of the antidumping statute.[14]  The Court of

Appeals for the Federal Circuit has stated that because Commerce "possesses substantive

rulemaking authority," therefore, "deference is due to such administrative rulings, even when

there is no formal regulation at issue."  Pesquera Mares Australes Ltda. v. United States, 266

F.3d 1372, 1382 & n.6 (Fed. Cir. 2001) (citing Am. Silicon Techs. v. United States, 261 F.3d

1371, 1378 (Fed. Cir. 2001)).  In this regard the Court of Appeals for the Federal Circuit found

---

[14]  To be found proper, an agency's construction of a statute it administers must be in accordance with law.  Chevron U.S.A. Inc.  v. Nat'l Res. Def. Council, Inc., 467 U.S. 837 (1984); FAG Italia S.p.A v. United States, 291 F.3d 806, 815 (Fed. Cir. 2002) (citing Chevron, 467 U.S. at 843).  As stated by the Supreme Court:

> When a court reviews an agency's construction of the statute . . . it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842–43 (footnotes omitted).  Furthermore, "'[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly . . . .'"  Id. at 843 (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).  In United States v. Mead Corp., 533 U.S. 218 (2001), the Supreme Court stated deference was due if it is "apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law . . . ."  Mead, 533 U.S. at 229.

that permissible "statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Id.; Koenig, 24 CIT at __, 90 F. Supp. 2d at 1287 (citing Chevron, 467 U.S. at 843) ("The antidumping statute does not directly address collapsing. Thus, in determining whether Commerce's collapsing practice is in accordance with law, 'the question for the court is whether the agency's answer is based on a permissible construction of the statute.'"). Indeed, when reviewing Commerce's market economy collapsing methodology prior to such methodology being reduced to regulation, this court stated that because Commerce had "articulated a reasonable set of inquiries for answering the central question, whether parties are sufficiently related to present the possibility of price manipulation . . . the Court finds Commerce's articulation of collapsing factors . . . to be in accordance with law." Queen's Flowers, 21 CIT at 979, 981 F. Supp. at 628 (examining Commerce's collapsing methodology under predecessor statute, 19 U.S.C. § 1677(13) (1988)). In examining Commerce's NME collapsing methodology, the court will not find such methodology to be a permissible interpretation of the statute unless it is "clear . . . which set of factors formed the basis of Commerce's collapsing determination." Id., 981 F. Supp. at 628 (citing SEC v. Chenery Corp, 318 U.S. 80, 94 (1943)). Thus, the court turns to the question of whether Commerce has sufficiently articulated a permissible interpretation of the antidumping statute with its stated NME collapsing methodology.

Here, Commerce set out portions of its analytical pathway for collapsing the Companies. First, Commerce stated that it

analyzed whether Ningbo Nanlian and HFTC5 are connected in

> such a way that it would frustrate the purpose of the statute to grant these companies separate antidumping duty margins. In doing so, we have considered, in particular, whether the record shows that any control relationships existed between HFTC5 and Ningbo Nanlian, either directly or through Ningbo Nanlian's parent companies . . . as contemplated by [19 U.S.C. § 1677(33)]. We have also considered whether the relationship provides a potential for manipulation of export activities, including pricing.

(Relationship Memo, Pub. R. Doc. 218 at 4.) Commerce further stated that it had examined whether the "significant potential for manipulation" was present through "intertwining." (See Decision Memo, Pub. R. Doc. 214 at 30, 31.) Thus, restated, Commerce examined: (1) whether the Companies were connected—i.e., "affiliated"—through "operational control" between two "persons"; and (2) whether any such control relationship presented the "significant potential for manipulation" of pricing or export decisions through "intertwining."[15]

For the most part, Commerce's NME exporter collapsing methodology follows that established for market economy entities. Thus, as the market economy collapsing methodology has been found by this court to be a permissible interpretation of the antidumping statute and such methodology is now contained in regulations adopted after a notice and comment period, to the extent that Commerce has followed its market economy collapsing regulations the NME exporter collapsing methodology is necessarily permissible. Where the NME exporter

---

[15] Commerce apparently found it unnecessary to consider the second factor used to make a collapsing determination in a market economy context, i.e., the characteristics of the product at issue, because the subject merchandise, crawfish tail meat exported by the Companies, was, in fact, identical. See 19 C.F.R. § 351.401(f)(1) (stating Commerce must determine whether affiliated producers "have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities . . . .").

methodology departs from these regulations, however, the court must examine it to determine whether it is a permissible interpretation of the antidumping statute. Thus, the court turns to each of these factors.

### 1. Affiliation

The first step in collapsing is to determine whether two entities are "affiliated." See 19 C.F.R. §§ 351.401(f)(1), .102(b). Here, Commerce identified 19 U.S.C. § 1677(33)(F) as "instructive" for determining whether two NME exporters are affiliated. This subsection provides:

> The following persons shall be considered to be "affiliated" or "affiliated persons": . . .
>
> > (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

19 U.S.C. § 1677(33)(F). Thus, to the extent that Commerce investigated by means of questionnaires and otherwise in accordance with established regulations whether the Companies were affiliated, such portion of its methodology is a permissible interpretation of the antidumping statute.

### a. "Persons"

In reducing its market economy collapsing methodology to regulation Commerce focused its analysis on "affiliated producers." See 19 C.F.R. § 351.401(f)(1). Here, however, Commerce determined that the collapsing regulation was not controlling as it spoke only of "producers" and

not NME exporters. In the absence of needed language, Commerce sought to increase the scope of its analysis in the instant investigation to include NME exporters. The court finds that increasing the scope of "persons" to include entities identified as "NME exporters" is a reasonable interpretation of the antidumping statute. It is Commerce's duty to implement "the basic purpose of the [antidumping] statute—determining current margins as accurately as possible," Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990), and it is Commerce's "responsibility to prevent circumvention of the antidumping law." Queen's Flowers, 21 CIT at 972, 981 F. Supp. at 622 (citing Mitsubishi Elec. Corp. v. United States, 12 CIT 1025, 1046, 700 F. Supp. 538, 555 (1988)). Generally, in NME antidumping investigations it is Commerce's policy to assign antidumping duty margins to NME exporters rather than to the producers who supply them.[16] See Final Rule, 62 Fed. Reg. at 27,305 (stating Commerce "intend[s] to continue calculating AD rates for NME export trading companies, and not the manufacturers supplying the trading companies"), cited in Tung Mung Dev. Co. v. United States, 25 CIT __, __, Slip Op. 01-83 at 24 (2001); see, e.g., Saccharin From the PRC, 67 Fed. Reg.

---

[16] Commerce explained:

> The [NME] separate rates policy reflects the Department's concern that the [NME] government may interfere in the export activities of companies selling to the United States and manipulate these companies' export prices. Where an exporter is able to demonstrate that its export activities are not controlled by the government, then the Department will recognize that independence by awarding the exporter a separate rate . . . .
>
> Because the exporter/trading company sets the export price, it is appropriate to focus the separate rates analysis on the exporter.

Disposable Pocket Lighters From the PRC, 60 Fed. Reg. 22,359, 22,363 (ITA May 5, 1995) (final results).

79,049, 79,051 (ITA Dec. 27, 2002) (prelim. determination) ("It is the Department's policy to assign all exporters of merchandise subject to investigation in an NME country . . . [a] single rate, unless an exporter can demonstrate that it is sufficiently independent so as to be eligible for a separate rate."); Certain Ball Bearings and Parts Thereof from the PRC, 67 Fed. Reg. 63,609, 63,612 (ITA Oct. 15, 2002) (prelim. determination) ("[T]he Department assigns separate rates in NME cases only if an exporter can demonstrate the absence of both de jure and de facto governmental control over its export activities."). Thus, because Commerce's practice of assigning antidumping duty margins to NME exporters rather than NME producers furthers its statutory mandate of assigning antidumping duty margins as accurately as possible, Rhone Poulenc, 899 F.2d at 1191, and preventing the circumvention of the antidumping laws, Queen's Flowers, 21 CIT at 972, 981 F. Supp. at 622, it is a permissible interpretation of the statute that "persons" in the instant investigation include NME exporters, rather than NME producers. Here, as Commerce has presented a permissible interpretation of the term "persons" for collapsing the Companies, the court finds that such use is entitled to deference by the court. Pesquera, 366 F.3d at 1382.

### b. "Control"

In order to find two or more market economy producers are "affiliated," Commerce must find that certain potential "control" relationships exist between such entities. By regulation several elements must be present for a finding of potential control. See 19 C.F.R. § 351.102(b). First, there must be some relationship between the parties. Id. Next, the relationship must be such that it has "the potential to impact decisions concerning the production, pricing, or cost of

the subject merchandise . . . ." Id. Finally, Commerce shall "consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control." Id. Apparently, because of its practice of assigning antidumping duty margins to NME exporters in NME investigations, Commerce altered its affiliation methodology to take into account the potential to impact export decisions. Here, Commerce defined control to mean that: (1) there existed the ability of one NME exporter to control another NME exporter, and (2) such control arose from the potential to impact decisions about pricing, production, or exports. (See Relationship Memo, Pub. R. Doc. 218 at 4 (citing Antidumping Duties; Countervailing Duties, 61 Fed. Reg. at 7310)); Certain Welded Carbon Standard Steel Pipe and Tubes From India, 62 Fed. Reg. 47,632, 47,638 (Sept. 10, 1997) (final results). The court finds this to be a sufficient articulation of Commerce's NME exporter collapsing methodology in the instant investigation as far as it goes. See Rhone Poulenc, 899 F.2d at 1191; Queen's Flowers, 21 CIT at 972, 981 F. Supp. at 622. Simply increasing the scope of its analysis to include the Companies' "export decisions," however, is insufficient. By regulation, in market economy situations, Commerce must consider the "temporal aspect" of entities' relationships.[17]

---

[17]     As Commerce explained in promulgating its regulations:

> The Department normally will not consider firms to be affiliated
> where the evidence of "control" is limited, for example, to a
> two-month contract. On the other hand, the Department cannot rule
> out the possibility that a short-term relationship could result in
> control. Therefore, the Department will consider the temporal
> aspect of a relationship as one factor to consider in determining
> whether control exists.

Final Rule, 62 Fed. Reg. at 27,298. The court understands this to mean that Commerce must
weigh the nature of entities' contacts over time, and must determine how such contacts
(continued...)

Here, Commerce does not address this element and, in its absence, does not explain why it is not necessary. In support of Commerce's NME export methodology the Government simply states, in full:

> In this case, Commerce considered whether Ningbo and HFTC(5) are connected in such a way that it would frustrate the purpose of the statute to grant them separate antidumping duty margins. In doing so, Commerce considered whether the record shows any control relationships existed between Ningbo and HFTC(5) either directly or through Ningbo's parent companies . . . as contemplated by [19 U.S.C. § 1677(33)].

(Def.'s Reply at 20.) While it may be that Commerce took into account the "temporal" aspect of the Companies' relationship, it is not possible to know if it did so from its determination. As it is not "clear . . . which set of factors formed the basis of Commerce's collapsing determination," Queen's Flowers, 21 CIT at 979, 981 F. Supp. at 628, the court cannot find Commerce's interpretation of "control" to be a permissible interpretation of the antidumping statute such that it is entitled to judicial deference. Pesquera, 366 F.3d at 1382.

### 2. Significant Potential For Manipulation

The final step in collapsing two market economy producers is to determine whether "there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). In determining what constitutes a "significant potential for the manipulation of price or production," Commerce may consider the level of common ownership, whether the producers share managerial employees or board members, or whether the producers' operations

---

[17](...continued)
potentially impact each entity's business decisions. Sporadic or isolated contacts between entities, absent significant impact, would be less likely to lead to a finding of control.

are "intertwined" such as "through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers." 19 C.F.R. § 351.401(f)(2). Finally, the potential for manipulation must be significant. See AK Steel, 22 CIT at 1080 n.22, 34 F. Supp. 2d at 764 n.22. Here, although Commerce stated that "the relationship between Ningbo Nanlian and HFTC5 is such that a significant potential for manipulation exists" because the Companies were "intertwined," there is no indication what factors were considered in reaching this conclusion. (See Decision Memo, Pub. R. Doc. 214 at 31, 30.) The court does not find this to be a sufficient articulation of a permissible interpretation of the antidumping statute. While the factors enumerated in 19 C.F.R. § 351.401(f)(2) for determining whether two entities are "intertwined" are non-exhaustive, the court cannot find Commerce's "articulation" of "intertwining" in the instant investigation to be a permissible interpretation of the antidumping statute because it is not "clear . . . which set of factors formed the basis of Commerce's collapsing determination." Queen's Flowers, 21 CIT at 979, 981 F. Supp. at 628.[18]

---

[18]    Although the presence of Mr. Wei as a common employee may be the source of a factor used in this finding, the lack of a specific statement of the factors considered relevant to the collapsing methodology in the instant investigation in either the Relationship Memo or the Decision Memo highlights the difficulty of ascertaining the standard Commerce did apply in collapsing the Companies and, therefore, what evidence is necessary to support its determination. While it is appropriate that Commerce develop its NME collapsing methodology over time, for this methodology to be found a permissible interpretation of the antidumping statute such reasoning must be clearly set out in a form that allows review. Queen's Flowers, 21 CIT at 979, 981 F. Supp. at 628.

### 3.      Substantial Evidence

Even if Commerce's NME exporter methodology were sufficiently articulated, based on the portions of this methodology found to be permissible herein, the court would not find Commerce's determination that the Companies were affiliated, should be collapsed and, therefore, should share a single antidumping duty margin, to be supported by substantial evidence.[19]

After reviewing the record Commerce stated that "the nature of the connections between HFTC5 and Ningbo Nanlian constitute a web of control relationships such that prices and exports are subject to significant manipulation." (Relationship Memo, Pub. R. Doc. 218 at 4.)  In support of this finding Commerce stated that it had "considered the totality of the record evidence relevant to the relationship between HFTC5 and Ningbo Nanlian, either directly or through Ningbo Nanlian's parent companies. . . ." (Id.)  Commerce further stated that "the relationship between HFTC5 and Ningbo Nanlian lead us to conclude Ningbo Nanlian and HFTC5 are little more than separate distribution channels for the same producer to the same customer." (Decision Memo, Pub. R. Doc. 214 at 57.)

---

[19]      For Commerce's determination to be upheld there must be evidence that there is more than the "mere possibility" that significant potential for manipulation could occur.  See U.S. Steel Group v. United States, 25 CIT __, __, 177 F. Supp. 2d 1325, 1331 (2001) (citing Zenith Elecs. Corp v. United States, 15 CIT 394, 406–07 (1991)) ("[T]he mere possibility that prices could be manipulated is insufficient grounds to require the agency to disregard sales in the absence of evidence creating a basis for reasonable suspicion of actual manipulation.").

### a. Affiliation

In concluding that a "web of control relationships" existed between NNL and HFTC5, Commerce stated that "numerous factors reflect that the relationship between these parties is such that there is potential to impact pricing and exports of the subject merchandise . . . ." (Relationship Memo, Pub. R. Doc. 218 at 4–5.) Reviewing the record, however, the court is able to discern only one such "factor": the activities of Mr. Wei.

There is evidence on the record that Mr. Wei provided various services to both HFTC5 and NNL during NNL's POR. In addition, the record contains ample evidence that Mr. Wei represented himself as HFTC5's Vice General Manager to HFTC5's customers as well as to Customs throughout NNL's POR. (See Customs Report, Attach.) Indeed, there is some support for the conclusion that Mr. Wei may have been acting in some capacity as NNL's Vice General Manager during NNL's POR in that his name appears on NNL's original business license as its "Vice General Manager" and, as stated by Commerce, "Mr. Wei was charged with approving and placing his signature stamp, on behalf of Ningbo Nanlian, on export sales paperwork prepared by Ningbo Nanlian staff . . . . In addition, Mr. Wei also ensured that Ningbo Nanlian fulfilled all required export formalities and inspected the quality of the crawfish that [Hontex] purchased from Ningbo Nanlian." (Relationship Memo, Pub. R. Doc. 218 at 8.) Although the record supports these findings, the court cannot agree that the cited instances of Mr. Wei interacting with HFTC5 and NNL support a conclusion that there were "control" relationships between them. See 19 U.S.C. § 1677(33); 19 C.F.R. § 351.102(b). At no point does the evidence demonstrate that Mr. Wei was in control of both Companies or that his activities served to allow

one company or any third party to exercise control over the Companies. The evidence merely

demonstrates that the Companies shared an employee and nothing more.[20]


**b.       "Significant Potential for Manipulation"**

The essence of Commerce's conclusion that there was a "significant potential for

manipulation inherent in the relationship between Ningbo Nanlian and HFTC5" because their

"export activities . . . were under common control" (Decision Memo, Pub. R. Doc. 214 at 58; id.

at 30) was based on evidence of Mr. Wei's activities and the Companies "sharing" a common

supplier of crawfish tail meat. Such a conclusion, however, places more weight on the record

evidence of Mr. Wei's activities than those activities can be reasonably be said to bear for two

reasons: first, Commerce presents no evidence that there was actual manipulation of prices or

export decisions; second, Commerce nowhere points to direct evidence that Mr. Wei possessed

the "significant potential to manipulate" export or pricing decisions for either of the Companies

during NNL's POR. Indeed, the evidence shows that Mr. Wei's actions on behalf of the

Companies were performed at the direction of some other person—for HFTC5 it was the

"General Manager," for Louisiana Packing it was Mr. Lee—but Commerce presents no evidence

that either Mr. Lee or HFTC5's General Manager was directing Mr. Wei to make pricing or

---

[20]       As previously noted, Commerce is required to examine the "temporal" nature of entities' relationships prior to finding control exists. See 19 C.F.R. § 351.102(b); Final Rule, 62 Fed. Reg. at 27,298. However, since Commerce has not addressed the "temporal" aspect of the Companies' relationship the court is unable to determine whether the Companies' contacts through Mr. Wei were substantial enough to warrant a finding of control. Alternatively, if it is Commerce's position that the "temporal" nature of the Companies' relationship is irrelevant to collapsing NME exporters, it has not fully explained its reasons why that aspect need not be considered.

export decisions on behalf of the other company or, indeed, that he could have done so.[21]

The only other basis for collapsing the Companies is Commerce's conclusion that a "web of control relationships" existed between them. Even given Mr. Wei's involvement with the Companies' crawfish tail meat business, Commerce points to no evidence supporting the conclusion that one company had the "significant potential to manipulate" export or pricing decisions of the other. In order for a determination to be upheld by substantial evidence Commerce must draw reasonable inferences from the evidence of record. Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (citing Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 932 (Fed. Cir. 1984)). The mere employment of the same person by both Companies, while providing some evidence that the Companies were "intertwined," does not rise to the level of a "web of control relationships" that would be sufficient to support a collapsing determination in a market economy country, and there appears to be no sound reason why it should be found sufficient here. See, e.g., 19 C.F.R. § 351.401(f)(2) (stating operations are "intertwined," for example, "through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.").

---

[21] While it may be that the services Mr. Wei provided each company were "significant," Commerce nowhere explains how such activity, no matter how critical to each company's crawfish tail meat export business, had the significant potential to impact the pricing or export decisions of either company.

### c.    "Separate Distribution Channels"

In the Decision Memo Commerce stated that "aspects of the relationship between HFTC5 and Ningbo Nanlian lead us to conclude that Ningbo Nanlian and HFTC5 are little more than separate distribution channels for the same producer to the same customer." (Decision Memo, Pub. R. Doc. 214 at 57.)  The court does not agree that Commerce's conclusion is supported by substantial evidence for several reasons.  First, as to the 1997 crawfish harvest season, the determination contains no clear explanation or evidence that would support a finding of control relationships by which any crawfish producer could potentially control or be controlled by any exporter.  Similarly, there is no clear explanation as to where the significant potential for manipulation might arise or how a particular producer might control export or pricing decisions.  Next, Commerce presents no evidence or analysis of how Hontex, as a customer, would have been able to control the decisions of any PRC producer or exporter during the 1997 season nor does it present any evidence that Hontex was even aware of the identities of the producers who supplied crawfish tail meat to the exporters.  The record simply shows that Hontex bought crawfish tail meat from NME exporters.  There appears to be no evidence that Hontex was aware of which producer or producers supplied the trading companies with the subject merchandise, much less that Hontex controlled them.  Finally, although the 1998 crawfish season presents a different picture—in that Hontex actively sought out a PRC crawfish tail meat producer[22] and then arranged for that producer to sell its entire crawfish tail meat harvest to NNL (see Relationship Memo, Pub. R. Doc. 218 at 5)—Commerce presents no evidence that any other

---

[22]    The identity of this crawfish tail meat producer is claimed to be business proprietary information.  (See Relationship Memo, Conf. R. Doc. 39 at 5.)

exporter was a "distribution channel" for that producer's crawfish output to Hontex during

NNL's POR, or that it was possible for any other exporter to be a "distribution channel" for that

producer's crawfish harvest, as 100 percent of that harvest was sold to NNL. (Id.)

## III.    Factors of Production

In NME antidumping investigations Commerce is directed to use the actual "normal

value" for factors of production where such information is available. See 19 U.S.C. § 1677b(a).

Where such information is not available Commerce is directed to use "constructed value" for that

factor.[23] See 19 U.S.C. § 1677b(c)(1)(A)–(B); Nation Ford Chem. Co. v. United States, 166 F.3d

---

[23]    To determine whether subject merchandise is being, or is likely to be, sold in the United States at less than fair value, Commerce must make "a fair comparison . . . between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.401(a). Where, as here, the subject merchandise is exported from an NME country, Commerce is directed by statute to calculate normal value "on the basis of the value of the factors of production utilized in producing the merchandise . . . ." 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(a). When valuing factors of production in NME circumstances, subsection 1677b(c) directs Commerce to gather surrogate prices from the "best available information . . . in a market economy country . . . considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(2); see Nation Ford, 166 F.3d at 1377 ("Whether such analogous information from the surrogate country is 'best' will necessarily depend on the circumstances, including the relationship between the market structure of the surrogate country and a hypothetical free-market structure of the NME producer under investigation."). This being the case, "the process of constructing foreign market value for a producer in a nonmarket economy is difficult and necessarily imprecise . . . ." Sigma, 117 F.3d at 1408. Commerce enjoys wide discretion in valuing factors of production. See Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994); see also Sigma, 117 F.3d at 1405 (citing Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)) ("Commerce . . . has broad authority to interpret the antidumping statute . . . ."). However, Commerce's discretion in calculating surrogate prices is not limitless. See H.R. Conf. Rep. No. 100-576, at 590 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("Commerce shall avoid using any prices which it has reason to believe or suspect may be . . . subsidized prices."); see also Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the factors of production, the critical question is whether the methodology used by

(continued...)

1373, 1375 (citing 19 U.S.C. § 1677b(c)). During the course of the instant investigation

Commerce determined that chitin, which is extracted from crawfish shell, was a by-product of

the crawfish tail meat production process in the PRC. As such, chitin has value, and Commerce

found that an economic benefit accrued to NNL, and applied that benefit as an offset when

calculating the costs of production. In order to find a value for this factor, Commerce relied on

data covering dry shells from Canada. NNL, however, did not provide prices for dry shells but,

rather, for "wet" crawfish scrap.[24] Because Commerce could find no data on the amount of

usable shell—and, thus, extractable chitin—in wet crawfish scrap, it relied on a wet scrap to dry

shell "conversion factor" provided by Defendant-Intervenors.[25] Applying this conversion factor

Commerce determined that, by weight, raw wet crawfish scrap was comprised of thirty percent

usable dry shell. In justifying the use of this conversion factor Commerce stated:

> Information has been placed on the record of [this review]
> establishing a dry-to-wet conversion factor for various forms of
> crustacean shell scrap. Other than claiming that the information
> contained therein is unsubstantiated, Ningbo Nanlian . . . [has] not
> placed any additional information on the record which would call
> into question the accuracy of this conversion factor, nor have they
> placed any information on the record with respect to how wet or

---

[23](...continued)
Commerce is based on the best available information and establishes antidumping margins as
accurately as possible.").

[24]     "[T]he term 'scrap' is used to refer to that portion of a live crawfish that is not
physically included in the subject merchandise, crawfish tail meat. The principal components of
scrap are shell, unused meat, and water." (Surrogate Value for Crawfish Scrap Byproduct
Submission of 6/29/99, Pub. R. Doc. 68 at 1.)

[25]     The information provided was in the form of excerpts of a symposium article
entitled Chitin and Chitosan: The Versatile Environmentally Friendly Modern Materials
published by the Penerbit Universiti Kebangsaan of Malaysia in 1995. (See Surrogate Value for
Crawfish Scrap Byproduct Submission, Pub. R. Doc. 68 Ex. 9 (article).)

> dry their scrap is, despite the fact that petitioner raised this
> issue . . . .

(Decision Memo, Pub. R. Doc. 214, Comment 26.)

Hontex argues that Commerce's reliance on the submitted conversion factor is not supported by substantial evidence or otherwise in accordance with law because this submission

> did not give any clue as to how the 30% ratio was derived, so it is impossible to know whether the ratio was calculated on a scientific basis, whether it was a "guesstimate," or some other process. Also, there are various gradations of "wet" and "dry," and it is not known how "wet" the shells were that were the subject of the article. There is also no evidence on the record as to how "wet" or "dry" the crawfish scrap was that was sold by [NNL] in this Administrative Review. It could have very well been much drier than that which was the subject of the article. If so, the 30% ratio may very well have radically and impermissibly reduced [NNL's] by-product credit.

(Pl.'s Mem. at 81–82.) In response, Defendant-Intervenors state the submission

> included . . . an estimate of the total global potential for chitin production using waste from shrimp, squid, crab, and other animals. In calculating this estimate, [the author] applied ratios to the estimated global waste from processing for each type of animal in order to arrive at the corresponding amount of dry material available globally from which chitin could be extracted.

(Def.-Intervenors' Resp. at 6.) Defendant-Intervenors also state the thirty percent ratio had been repeatedly used in the investigation and, despite several opportunities to respond to this issue, "neither Plaintiff nor any other respondent submitted any factual information to contradict or cast doubt upon the 30% conversion ratio . . . ." (Def.-Intervenors' Resp. at 7 (emphasis removed).)

The thrust of Hontex's argument is that the information relied upon by Commerce was

unreliable. Hontex, however, nowhere argues that it asked Commerce to verify such information and, in the absence of such a request, no verification is required.[26] See 19 U.S.C. § 1677m(i)(3); Shakeproof, 268 F.3d at 1383 (citing 19 U.S.C. § 1677m(i) (1994) and stating "[i]n all cases . . . verification must be timely requested by an interested party.").[27] In addition, an examination of data presented in the article relied upon by Commerce demonstrates that, contrary to Plaintiff's contention, a source is given for the thirty percent conversion factor. (See Chitin and Chitosan: The Versatile Environmentally Friendly Modern Materials, Pub. R. Doc. 68, Ex. 9 at 33 n.*** (tbl. 2.9) (citing G.G. Allan, et al, A Critical Evaluation of the Potential Sources of Chitin and Chitosan, in Proceedings of the First Int'l Conf. on Chitin and Chitosan (MIT Sea Grant Report MITSG 78-7) 64–78 (R.A.A. Muzzarelli & E.R. Pariser, eds. 1978)).) Therefore, because Commerce enjoys considerable discretion in valuing factors of production in NME investigations, Lasko, 43 F.3d at 1446, its use of the wet-to-dry conversion factor submitted by Defendant-Intervenors to help calculate a value for NNL's crawfish tail meat scrap is in

---

[26] At the administrative level Hontex argued that "these figures come from a single article from Malaysia, with absolutely no substantiation, i.e., we have absolutely no idea how these figures were derived. This is not the type of evidence on which the Department can reasonably rely in reducing the value granted by-product credit by 70% or more." (Reply Brief to Petitioner's Nov. 24, 1999, Case Brief, Pub. R. Doc. 131 at 12–13.) This argument appears to attack the basis of the information provided, thus, possibly calling into question whether Commerce should have verified it. Hontex, however, nowhere argues that it timely requested verification of the Defendant-Intervenor's secondary information at the administrative level or that it was prevented from doing so such that "good cause for verification is shown." See 19 U.S.C. § 1677m(i)(3).

[27] Hontex also argues that the specific application of the thirty percent ratio to NNL's scrap was improper. This argument is also unpersuasive. Presumably, any information as to the actual "wetness" of NNL's scrap and, thus, the proper wet-to-dry ratio to be applied by Commerce, was in the sole possession of NNL. Hontex, however, nowhere argues that NNL was prevented from submitting evidence as to the "wetness" of NNL's scrap even though Commerce was considering using Petitioners' proffered ratio.

accordance with law; and the sources upon which it relied demonstrate that its conclusion is supported by substantial evidence.

**CONCLUSION**

For the reasons set forth above, this matter is remanded to Commerce for further proceedings in conformity with this opinion. On remand Commerce shall: (1) clearly set out the NME collapsing methodology used to reach the Final Results and clearly articulate why such methodology is a permissible interpretation of the antidumping statute, or develop a different methodology and clearly articulate why it is a permissible interpretation of the antidumping statute; (2) detail the manner in which either such methodology departs from existing regulations dealing with collapsing in market economy countries and the justifications and authority for doing so; (3) explain how the temporal aspect of the Companies' relationship affected its determination, and if the temporal aspect of the relationship was not taken into account, take it into account, or explain why; (4) state with specificity the "numerous factors" used to reach its finding that a "significant potential for manipulation" of pricing and export decisions existed; and (5) state with specificity the factors used in its determination that NNL and HFTC5 were "intertwined."

Further, Commerce shall identify specific evidence on the record sufficient to support any finding under any new methodology or determination or, if no new methodology or determinations are developed, identify specific evidence on the record of: (1) how the activities and relationship of Mr. Wei with respect to NNL and HFTC5 constituted a "web of control

relationships" such that finding of affiliation between NNL and HFTC5 was justified; (2) how the activities and relationship of Mr. Wei with respect to NNL and HFTC5 could justify a finding that a "significant potential for the manipulation" of pricing and export decisions existed. In doing so, Commerce shall keep in mind that Mr. Wei's mere employment by both NNL and HFTC5 will not be found to justify such finding; (3) the specific pricing and/or export activities that were subject to "significant potential for manipulation." Commerce shall also detail the manner in which NNL and HFTC5 were "little more than separate distribution channels from the same producer to the same customer" during NNL's POR and state how such activities were in violation of the antidumping law, including any finding of affiliation and "substantial potential for manipulation." Commerce shall explain with specificity how this finding warranted collapsing the two companies.

Such remand results are due within 90 days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments 11 days from their filing.

_____
Richard K. Eaton

Dated: February 13, 2003
New York, New York